# EXHIBIT 1

# CONDENSED COPY

```
 1        IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF DELAWARE
 2
                      -    -    -
 3

    JEFFREY McCANTS          :
 4                           :
              V.             :  C.A. NO. 04-257 (KAJ)
 5                           :
    WAWA, INC.               :
 6
 7
 8                    -    -    -
 9             November 1, 2004
10                    -    -    -
11             Oral deposition of JEFFREY
12   McCANTS, held in the law offices of PEPPER
13   HAMILTON, LLP, Hercules Plaza, Suite 5100,
14   Wilmington, Delaware, commencing at 9:55
15   a.m., on the above date, before Melissa M.
16   Johnston, a Professional Reporter and a
17   Notary Public of the State of Delaware.
18
19                    -    -    -
20
21        LOVE COURT REPORTING, INC.
              1500 Market Street
22          12th Floor - East Tower
          Philadelphia, Pennsylvania 19102
23              (215) 568-5599
24
```

A-1

Jeffrey McCants

Page 38

1   What were you going to be selling?
2       A.   Toiletries, fragrances.
3       Q.   Was this an outside sales
4   job? Do you know what that means?
5       A.   No.
6       Q.   Was it a job that you were
7   going to report to an office? Did you have
8   an office for the job or were you going to
9   work out of your home doing sales?
10      A.   I don't remember.
11      Q.   Where is Products, Inc.
12  located?
13      A.   I believe in New Castle.
14      Q.   Did you look for any jobs in
15  the retail sector when you left Wawa?
16      A.   Yes.
17      Q.   What specific companies did
18  you consider if you considered retail
19  companies?
20      A.   KFC.
21      Q.   Is that Kentucky Fried
22  Chicken?
23      A.   Yes.
24      Q.   Was that managing a franchise?

Page 39

1       A.   Yes.
2       Q.   Is it a franchise run
3   business?
4       A.   It was a manager's position.
5       Q.   Where was the store located?
6       A.   I don't remember.
7       Q.   Did you get that job?
8       A.   No.
9       Q.   You didn't get a job offer?
10      A.   No.
11      Q.   Do you know why?
12      A.   No.
13              - - -
14      (Whereupon, Exhibit McCants-4 was
15  marked for identification.)
16              - - -
17  BY MS. BILENKER:
18      Q.   Mr. McCants, I'm showing you
19  Exhibit 4. This is the Complaint you filed
20  in this case or your lawyer filed on your
21  behalf. Is this, in fact, the Complaint
22  that you filed in this case? Have you ever
23  seen this document before?
24      A.   Yes.

Page 40

1       Q.   What is this document? Is it
2   the Complaint you filed in this case?
3       A.   Yes.
4       Q.   Did you review this document
5   before your lawyer filed it?
6           MR. ABER:  Objection. I
7   instruct the witness not to answer.
8   BY MS. BILENKER:
9       Q.   I'll ask a different
10  question. Would you turn to page 2, Mr.
11  McCants. Paragraphs 7 through 14 are your
12  factual allocations in this case. Do you
13  see how the sentences are numbered?
14      A.   These pages are not numbered.
15      Q.   No; the paragraphs. Us
16  lawyers, we call them numbered paragraphs,
17  but they're really just sentences that are
18  numbered in an outline format.
19      A.   You said page 2.
20      Q.   Well, the second page. You're
21  right. They're not numbered. The second
22  page. You're looking at numbers 7 through
23  14. Those are the paragraphs I want you to
24  focus on. Those are your factual

Page 41

1   allegations in this case. I would like to
2   go through these, and I want to know what
3   the basis is for your making these
4   allegations. Paragraph 7, you began
5   employment with Wawa on or about October
6   10, 1997. On October 10, 1977. Is that
7   accurate?
8       A.   Yes.
9       Q.   Then you allege that beginning
10  in November, 2001, while working in a
11  facility owned by the defendant, you were
12  denied a promotional opportunity to be
13  given a position as a manager at a gas
14  store. What gas store are you referring
15  to?
16      A.   Gas store at 840.
17      Q.   So you're alleging that you
18  applied for a position as manager of 840,
19  and that would have been a promotion for
20  you, and you didn't get the promotion. Is
21  that your allegation?
22      A.   Repeat that please.
23      Q.   In this allegation, are you
24  saying that you applied for a gas store

11 (Pages 38 to 41)

Jeffrey McCants

Page 42

1   manager position which would have been a
2   promotion for you, but you didn't get the
3   promotion?
4        A.   Is that two questions?
5        Q.   Did you apply for a gas store
6   manager position at 840?
7        A.   Yes.
8        Q.   Did you get the job?
9        A.   No.
10       Q.   The next allegation, you say
11  that the person who got, meaning "gas
12  store" is 840 was a white person?
13       A.   Is this based on number 9?
14       Q.   Yes. Let me rephrase. What's
15  the basis for your allegation number 9?
16       A.   The position was given to a
17  Caucasian individual.
18       Q.   How do you know that?
19       A.   It was told to me by my
20  supervisor.
21       Q.   Who is your supervisor?
22       A.   John Poplawski.
23       Q.   Do you know the name of the
24  person who you're referring to?  The

Page 43

1   Caucasian individual you're referring to?
2        A.   George Sheldton.
3        Q.   How do you know that?  From
4   John Poplawski?
5        A.   Yes.
6        Q.   Did you ever talk to George
7   Sheldton about the job?
8        A.   No.
9        Q.   When did John Poplawski tell
10  you that the job went to George Sheldton?
11       A.   I believe the next day after
12  the interviews.
13       Q.   Was that in person or over the
14  phone?
15       A.   Over the phone.
16       Q.   Did you call John or did John
17  call you?
18       A.   I called him.
19       Q.   Why did you call him?
20       A.   I wanted to know the results.
21       Q.   What time of day was it when
22  you called him?
23       A.   At night.
24       Q.   How did you know the results

Page 44

1   were ready when you called John?
2        A.   I didn't know.
3        Q.   What did John tell you during
4   that conversation?
5        A.   That I didn't get the gas
6   store.
7        Q.   Did he tell you why?
8        A.   No.
9        Q.   He didn't give you a reason?
10       A.   No.
11       Q.   What else did he say?
12       A.   I didn't get the store.
13       Q.   Did he tell you who got the
14  store —
15       A.   Yes.
16       Q.   — during that conversation?
17       A.   Yes.
18       Q.   So you learned it was George
19  Sheldton during that conversation with John
20  Poplawski?
21       A.   Yes.
22       Q.   How long was that
23  conversation?
24       A.   I don't remember.

Page 45

1        Q.   Did you discuss anything else
2   during that conversation with John
3   Poplawski?
4        A.   Don't remember.
5        Q.   Will you look at paragraph 10
6   please, Mr. McCants, and tell me what the
7   basis of that allegation is?
8        A.   Your question is?
9        Q.   What's the basis for this
10  allegation that because of the denial of
11  the promotion, you complained to John
12  Poplawski about a lack of diversity and
13  opportunities for minority employees?  Are
14  you alleging that you filed a grievance
15  with Wawa?  What's your basis of this
16  allegation?
17       A.   I met with Mr. Poplawski at
18  store 825 after finding out I didn't get
19  the store.  And, at the time, there were no
20  black gas store managers and I asked them
21  about the lack of diversity.
22       Q.   Anything else?
23       A.   No.
24       Q.   How do you know there were no

Jeffrey McCants

Page 46

1  black gas store managers at that time? Did
2  you have firsthand knowledge that there
3  were no black gas store managers at the
4  time?
5      A.  Rephrase the question.
6      Q.  Do you have firsthand
7  knowledge that there were no black gas
8  store managers at the time?
9      A.  In my area, there was no black
10  managers.
11      Q.  What is your area?
12      A.  It's considered area 8.
13      Q.  What does that area cover?
14  What geographic region?
15      A.  I believe Wilmington, New
16  Castle, Newark and Claymont.
17      Q.  Did you know for sure there
18  were no gas store managers in your area at
19  the time? Did you know that for sure
20  because you were certain about that?
21      A.  Yes.
22      Q.  You were certain about it?
23      A.  Yes.
24      Q.  Did you tell Mr. Poplawski

Page 47

1  that the reason you didn't get the job was
2  because you were black?
3      A.  No.
4      Q.  Did you tell Mr. Poplawski
5  that there were no opportunities for
6  minority employees at Wawa?
7      A.  No.
8      Q.  So your testimony is that you
9  just said to him that there wasn't
10  diversity?
11      A.  My question to him was -- to
12  Mr. Poplawski was about diversity, and he
13  said Wawa doesn't do a good job on
14  diversity.
15      Q.  Did he say anything else?
16      A.  No.
17      Q.  That was it? That was all he
18  said to you?
19      A.  That's all I remember.
20      Q.  How many days after your phone
21  conversation with John Poplawski did this
22  conversation in your store take place with
23  him?
24      A.  I believe a couple days.

Page 48

1      Q.  Do you think that to achieve
2  diversity, if you are not qualified for
3  that job, Wawa should have given it to you
4  anyway?
5      A.  Repeat.
6      Q.  In an effort to achieve
7  diversity, do you think you should have
8  gotten the job? By you getting that gas
9  store manager job, in your opinion, does
10  that make Wawa more diverse?
11      A.  No.
12      Q.  What do you mean by diversity
13  then? What did you mean by your comment to
14  Mr. Poplawski? Just that there weren't any
15  other gas store managers who were black at
16  the time?
17      A.  Yes. And black managers and
18  upper management outside of the stores.
19      Q.  Did you say anything else to
20  him about a lack of diversity, or was it
21  just comments about upper management, other
22  black gas store managers and other black
23  manager at Wawa, that there wasn't
24  diversity?

Page 49

1      A.  Yes.
2      Q.  That was the extent of the
3  conversation?
4      MR. ABER:  Can I have the last
5  question read back again?
6          -  -  -
7      (Whereupon, the requested
8  portion of the notes of testimony
9  was read by the court reporter.)
10          -  -  -
11      MR. ABER:  I object to the
12  last --
13      MS. BILENKER:  Let me
14  rephrase it.
15  BY MS. BILENKER:
16      Q.  Did you think you didn't get
17  the gas store manager job because of your
18  race?
19      A.  Yes.
20      Q.  What is the basis for that
21  belief?
22      A.  My belief at the time, to my
23  knowledge, there were no black gas store
24  managers or any black employees in the

13 (Pages 46 to 49)

Jeffrey McCants

Page 50

1  corporate office in upper management.
2      Q.   Anything else?
3      A.   No.
4      Q.   And I believe I already asked
5  you whether you knew for sure whether there
6  are no black gas store managers in your
7  area, and that is area 8, which you
8  testified was a portion of Delaware;
9  correct?
10     A.   Yes.
11     Q.   You don't have knowledge as to
12 whether there were black gas store managers
13 outside your area; correct?
14     A.   Yes.
15     Q.   And your belief that you
16 believe there were no black employees in
17 the corporate office or upper management,
18 do you know that for sure?
19     A.   Rephrase the question.
20     Q.   Do you know for sure that
21 there were no blacks in upper management or
22 working at Wawa corporate offices?  Where
23 Wawa is headquartered; is that what you
24 mean when you say corporate office?

Page 51

1      A.   At the time, I believe there
2  was one.  There wasn't a great showing of
3  blacks in upper management.
4      Q.   And my question to you is:
5  How do you know that for sure?
6      A.   Through hearsay.
7      Q.   Did you intend for your
8  conversation with John Poplawski that we
9  were talking about where you mentioned
10 diversity and John's response to you about
11 how Wawa should do a better job, that's
12 your testimony; right?  Or that Wawa
13 doesn't do a good job?
14     A.   Repeat that please.
15     Q.   Your conversation with John
16 Poplawski that we talked about that was two
17 days following the phone conversation you
18 had with him where you said there was a
19 lack of diversity, and John's response to
20 you was Wawa could do a better job?  Is
21 that your testimony?
22     A.   I believe I said John
23 Poplawski stated that Wawa doesn't do a
24 great job of diversity.

Page 52

1      Q.   Did you intend to file a
2  grievance with Wawa for that during that
3  conversation?  What was your point in
4  mentioning that to him?
5      A.   To get a real -- at the time,
6  to get a real understanding outside of
7  saying I wasn't qualified, which I knew I
8  was, for the position.  That's what
9  prompted that question.
10     Q.   Did Mr. Poplawski ever say you
11 weren't qualified for the job?
12     A.   I don't remember.
13     Q.   He told that you George
14 Sheldton got the job?
15     A.   Yes.
16     Q.   Did he explain why George
17 Sheldton got the job?
18     A.   I don't remember.
19     Q.   Do you know anything about
20 George Sheldton's work history at Wawa?
21     A.   No.
22     Q.   If Wawa thought that George
23 Sheldton was more qualified than you, would
24 it be reasonable for them to hire George

Page 53

1  Sheldton over you?
2      A.   If it was based on
3  credentials.
4      Q.   So the answer is yes?
5      A.   If it was based on
6  credentials.
7      Q.   If Wawa had an honest belief
8  that George Sheldton was more qualified
9  than you, would it be reasonable for them
10 to hire him over you to manage the gas
11 store?
12     A.   If it was based on
13 credentials.
14     Q.   And that's my question.  If
15 Wawa honestly believed that George Sheldton
16 had more credentials than you or was more
17 qualified than you to manage the gas store,
18 and we're talking about 840, would it be
19 reasonable for them to hire him?
20     MR. ABER:  Objection.
21     MS. BILENKER:  What's the
22 objection?
23     MR. ABER:  The definition of
24 honest.

Love Court Reporting, Inc.

Jeffrey McCants

Page 54

BY MS. BILENKER:
1  Q.   My question is very simple,
2  Mr. McCants. If Wawa believed that Mr.
3  Sheldton had more qualifications than you,
4  would it be reasonable for them to hire him
5  over you?
6  A.   If it was based on
7  credentials.
8  Q.   And that is part of my
9  question, that they believed he had more
10 credentials than you.  Let's assume Wawa
11 believed George Sheldton was more
12 qualified, had more credentials, however
13 you want to state it, would it be
14 reasonable for them to hire him?
15 A.   If it was based on
16 credentials.
17 Q.   It's a yes or no answer.
18         MR. ABER: No, it isn't. It
19 does not have to be a yes or no
20 answer. He can answer it any way he
21 wants to.
22         MS. BILENKER: Well, I have my
23 answer.

Page 55

BY MS. BILENKER:
1  Q.   Let's assume that Mr. Sheldton
2  had worked in a gas store for 25 years.
3  Would it be reasonable for them to offer
4  him the job over you?
5  A.   If it was based on
6  credentials.
7  Q.   And part of the credentials
8  were he worked in a gas store before.
9  Would it be reasonable for them to think
10 that he had more credentials than you
11 managing a gas store?
12 A.   I can't answer for Wawa.
13 Q.   Do you think you were more
14 qualified than George Sheldton?
15 A.   I was qualified for the
16 position.
17 Q.   Do you think you were more
18 qualified or equally qualified or less
19 qualified than George Sheldton?
20 A.   I don't know George's
21 qualifications.
22 Q.   Is it true that you didn't
23 know the qualifications of anybody who
24

Page 56

1  applied for the gas store promotion?
2         (Telephone interruption.)
3  BY MS. BILENKER:
4  Q.   Mr. McCants, did you hear my
5  last question?
6  A.   Can you repeat it please?
7  Q.   Isn't it true you don't know
8  the qualifications of anybody who applied
9  for that gas store position?
10 A.   No.
11 Q.   It's not true or is it true?
12 A.   Repeat the question.
13 Q.   My question is:  There were
14 other people who applied for the gas store
15 position in addition to you?  Do you know
16 who those people are?
17 A.   Which store?
18 Q.   We're talking about the gas
19 store promotion you applied for that you
20 allege in your complaint, 840.
21 A.   840?
22 Q.   I believe it was Tom Grant,
23 George Sheldton, and George DeNuzio.  Do
24 you know anything about their

Page 57

1  qualifications or work history with Wawa?
2  A.   No.
3  Q.   No; you don't know anything
4  about their qualifications and you don't
5  know anything about their work history?
6  A.   No and no.
7  Q.   I'll split the question up.
8  Do you know anything about their
9  qualifications?
10 A.   No.
11 Q.   And you don't know anything
12 about their work history --
13 A.   No.
14 Q.   -- at Wawa?  If you turn to
15 the next page, Mr. McCants, you will see
16 that you start off alleging that on May 21,
17 2002, your Caucasian supervisor informed
18 you that you would be demoted.  Who are you
19 referring to?
20 A.   Joe Gallagher.
21 Q.   How did Mr. Gallagher inform
22 you that you would be demoted?
23 A.   In person.
24 Q.   Where were you?

15 (Pages 54 to 57)

Jeffrey McCants

Page 62

1  that you were going to be demoted.
2      A.  I believe I asked about salary
3  on the phone conversation we had. I don't
4  remember asking then about salary.
5      Q.  A phone conversation when?
6  After this meeting?
7      A.  I believe so.
8      Q.  We'll get to a phone
9  conversation. I want to know everything
10 about this meeting with Mr. Gallagher at
11 store 816 where you were notified that you
12 were going to be demoted. Okay? So once
13 we've exhausted this meeting, then we'll
14 move to the phone conversation you just
15 alluded to. All right? So —
16     A.  Rephrase the question.
17     Q.  I just want to focus on this
18 meeting, face-to-face meeting you had with
19 Mr. Gallagher that you allege happened in
20 your complaint.
21     A.  Uh-huh.
22     Q.  You allege he notified you you
23 were being demoted?
24     A.  Uh-huh.

Page 63

1      Q.  I just want to know what was
2  discussed at that meeting. So I'm asking
3  you if salary was discussed at that
4  meeting?
5      A.  I don't remember.
6      Q.  Then my next question to you
7  was: Did you ask Mr. Gallagher what your
8  salary was going to be as an assistant
9  manager during that meeting?
10     A.  I don't remember.
11     Q.  Isn't it true you told Mr.
12 Gallagher during that meeting you were
13 concerned about what other Wawa associates,
14 especially the ones that work for you, were
15 going to think about you stepping
16 down — thinking about you stepping down to
17 assistant manager?
18     A.  Don't remember.
19     Q.  Isn't it true you asked Mr.
20 Gallagher if it would be okay if you
21 couched the demotion as a resignation —
22     A.  Don't remember.
23     Q.  — to your staff? Isn't it
24 true that you told your staff that you were

Page 64

1  stepping down to pursue some other
2  opportunities?
3      A.  Don't remember.
4      Q.  Isn't it true that you thanked
5  Mr. Gallagher for showing concern about
6  you?
7      A.  Don't remember.
8      Q.  Do you remember shaking his
9  hand during that conversation?
10     A.  I shake everybody's hand.
11     Q.  Do you remember giving him a
12 hug during that conversation?
13     A.  I might have because I'm a
14 Christian.
15     Q.  Well, would that be because
16 you're a Christian or because you were
17 thankful that he was giving you an
18 opportunity to step back and retrain?
19     A.  Because I'm a Christian.
20     Q.  So you hug everybody —
21     A.  Yes; that wants to be --
22     Q.  — for no reason?
23     A.  Yes.
24     Q.  Isn't it true you told Mr.

Page 65

1  Gallagher that some day, you were going to
2  look back on this day and thank him for
3  having this meeting? That the pressure was
4  off?
5      A.  No.
6      Q.  It's not true that you were
7  appreciative that Mr. Gallagher was
8  permitting you to step down as assistant
9  manager so that the pressure and the stress
10 of running a Wawa store on your own was
11 going to be off?
12     A.  No.
13     Q.  How did the conversation end?
14     A.  I don't remember.
15     Q.  Is there anything else you
16 want to add about that conversation? Or
17 have you told me everything you can recall
18 during that conversation?
19         MR. ABER:  Objection.
20         MS. BILENKER:  You can
21 answer.
22         THE WITNESS:  Rephrase the
23 question please.
24 BY MS. BILENKER:

17 (Pages 62 to 65)

Jeffrey McCants

Page 66

1   Q.   Are you telling me everything
2   you can remember about that conversation
3   with Joe Gallagher?
4       A.   Yes.
5       Q.   If you look at the next
6   allegation, Mr. McCants?
7       A.   Which number?
8       Q.   12. On May 31, you allege you
9   were further retaliated against by
10  management because another white supervisor
11  and area manager said you were going to be
12  assigned a low production store in
13  Claymont, Delaware. Can you explain what
14  you mean by this allegation?
15      A.   I believe there was a phone
16  conversation between myself and Mr. Joe
17  Gallagher in reference to the demotion. It
18  was said that I was going to be demoted to
19  store 801.
20      Q.   Did you call Mr. Gallagher or
21  did Mr. Gallagher call you?
22      A.   I don't remember.
23      Q.   So you're saying that on May
24  31, you had a phone conversation with Mr.

Page 67

1   Gallagher? Or on or about May 31?
2       A.   On and about May 31.
3       Q.   That's how you were notified
4   you were going to store 801?
5       A.   It was through a phone
6   conversation.
7       Q.   You didn't meet with him in
8   person again?
9       A.   I don't remember.
10      Q.   What did you mean to say about
11  another Caucasian supervisor and area
12  manager? You're still referring to Mr.
13  Gallagher?
14      A.   Yes. The other manager was
15  Jim Shortall.
16      Q.   Isn't it true that a couple
17  days after your conversation with Mr.
18  Gallagher, and this is the first
19  face-to-face meeting that you had with him
20  about the demotion in store 816, isn't it
21  true you called Jim Shortall a couple days
22  later?
23      A.   Don't remember if it was a
24  couple days later, but I did contact him in

Page 68

1   reference to what was going on.
2       Q.   What did you tell Mr.
3   Shortall?
4       A.   I was asking or stating to him
5   what was going on with the demotion, you
6   know, what was the proof behind my
7   demotion? What was going on? And he said
8   he would get back to me, which he never did
9   get back to me.
10      Q.   Did you subsequently meet with
11  Mr. Gallagher?
12      A.   There was another meeting with
13  Mr. Gallagher and Mr. Mike Stief.
14      Q.   And perhaps that was Mr.
15  Shortall's way of explaining to you the
16  reason — having them re-explain the
17  reasons for your demotion?
18      A.   I don't know.
19      Q.   Did they explain the reasons
20  for your demotion during that second
21  meeting?
22      A.   Yes.
23      Q.   And what did they say?
24      A.   One was it was a financial

Page 69

1   statement. I had problems with my
2   financial statement. And morale.
3       Q.   Did you agree with those
4   reasons?
5       A.   No.
6       Q.   What was wrong with the
7   financial statement?
8       A.   I don't know.
9       Q.   They never explained it?
10      A.   No.
11      Q.   And you didn't ask?
12      A.   No.
13      Q.   What was wrong with morale?
14      A.   I don't know.
15      Q.   They never explained what was
16  wrong with morale?
17      A.   I don't remember.
18      Q.   You never asked them what they
19  thought was wrong with morale?
20      A.   I did ask what was going on
21  with morale. I don't remember what was
22  said.
23      Q.   You think that the store
24  associates who worked for you were happy?

18 (Pages 66 to 69)

Jeffrey McCants

Page 70

1      A.   I don't know.
2      Q.   Isn't that something you would
3  know as a manager?
4      A.   You would like to think you
5  know because some days people come in
6  happy, some people come in sad.  You don't
7  know if it's because of the store or they
8  have personal problems.
9      Q.   Would you find out as manager?
10     A.   Yes, I would.
11     Q.   Did you find out?
12     A.   Sometimes.
13     Q.   What do you mean by sometimes?
14     A.   If I saw a situation that was
15  really out of the normal with a person,
16  that if, for example, if they came in happy
17  all the time and if they were sad or
18  something was going on in their life that I
19  was privy to ask or if they would
20  volunteer, then, yes, I would look into it.
21     Q.   Was there a particular example
22  you have in mind?
23     A.   No.
24     Q.   So you don't recall ever

Page 71

1  asking one of your associates at the time
2  whether they were content in their job?
3      A.   No.
4      Q.   You said that you were
5  assigned a low production store in
6  Claymont, Delaware.  Do you know what store
7  you were referring to?  What store are you
8  referring to?
9      A.   Low production store.  Is that
10  on here?
11     Q.   Yes.  Number 12.  I'm still on
12  number 12.
13     A.   I don't remember if low
14  production.  It was -- the position was
15  assistant manager.
16     Q.   And assigned to a particular
17  store.  What store are you referring to?
18     A.   801.
19     Q.   So you disagree that that was
20  a low production store?
21     A.   I believe it was a lower value
22  store.
23     Q.   Than?
24     A.   The store I was at.

Page 72

1      Q.   And what are you basing that
2  belief on?
3      A.   The volume.
4      Q.   Did you know that for sure?
5  Isn't it true that 801 was a high-volume
6  store?
7      A.   I believe my store was an E
8  level and 801 was D.  And I believe the
9  focus was on the reduction in pay.
10     Q.   You're saying you were more
11  concerned about reduction in pay as an
12  assistant manager.  You weren't really
13  concentrating on the bonus potential or the
14  earnings potential of store?
15     A.   Both.
16     Q.   So tell me why you think 801
17  was a lower earning potential than 811.
18     A.   Volume.
19     Q.   And I asked you how you knew
20  that the volume wasn't as high as 801?
21     A.   Through hearsay.
22     Q.   What do you mean by E level
23  versus D level?  Can you explain that?
24     A.   From my understanding, the

Page 73

1  stores, the way they're categorized is
2  based on letters, the volume of the store.
3  So as you climb the alphabet, the higher
4  letter, as you climb the alphabet, as you
5  go up, indicates the volume of the store.
6  So, for example, if you have a D store,
7  it's higher than an A store.  C is higher
8  than an A.  C is higher than a B.
9      Q.   But you don't know for sure
10  whether 801 was a D level store?
11     A.   And I believe it was a D.
12     Q.   And you knew that for sure?
13  I'm just trying to understand why you think
14  801, as you allege, was a low production
15  store?
16     A.   I believe it was a D store.
17     Q.   Any other reason why you think
18  it's a low production store?
19     A.   No.
20     Q.   Isn't it true that you
21  suggested that Wawa move you to 801?
22     A.   No.
23     Q.   It's not true that that
24  suggestion originated with you?

19 (Pages 70 to 73)

Page 74

1    A.   No.
2    Q.   Is it your testimony that you
3 had no say whatsoever as to where Wawa was
4 going to move you?
5    A.   I had no say.
6    Q.   Aside from the discussion that
7 you had with Jim Shortall and Joe Gallagher
8 regarding 801, is there anything else
9 during that conversation -- and aside from
10 the reasons they said you gave you for the
11 demotion, inventory and morale, is there
12 anything else you can recall from that
13 conversation?
14    A.   No.
15    Q.   Did you accept the position
16 during that conversation?
17    A.   No.
18    Q.   What did you say regarding the
19 position?
20    A.   Well, there was a meeting, the
21 last meeting I had with Mr. Gallagher and
22 Mr. Stief.  That was the final meeting I
23 had.
24    Q.   I misspoke.  That's the

Page 75

1 meeting I'm talking about.  I think your
2 testimony was that you had a phone
3 conversation and then you had a meeting
4 with Joe Gallagher and Mike Stief; correct?
5    A.   That's correct.
6    Q.   And I'm talking about during
7 that meeting with Joe Gallagher and Mike
8 Stief, they informed you the reasons for
9 your promotion, which you said was a
10 financial statement and morale --
11    A.   Uh-huh.
12    Q.   -- being low.  And that they
13 notified you you were going to 801?
14    A.   Right.
15    Q.   Was it certain that you were
16 going to 801 or was that still up for
17 discussion?
18    A.   From my understanding, it was
19 either accept 801 or resign.
20    Q.   What did you do?
21    A.   Resigned.
22    Q.   But during that meeting, you
23 didn't tell them you resigned during that
24 meeting?

Page 76

1    A.   No.
2    Q.   What did you say about the
3 decision you were going to make?
4    A.   They left it up to me.
5    Q.   And what did you say?  You
6 would think about it?  You would tell them
7 tomorrow?
8    A.   No.  I'll think about it.
9    Q.   And was your wife present
10 during --
11    A.   Yes.
12    Q.   -- that conversation?  Why was
13 she there?
14    A.   For support.
15    Q.   And Wawa let her participate?
16    A.   Yes.
17    Q.   Did she take notes?
18    A.   I don't remember if she took
19 notes.
20    Q.   Did you look for those notes?
21    A.   I don't remember if she took
22 notes.
23    Q.   Did your lawyer ask you for
24 documents, to look for documents in this

Page 77

1 case in response to our interrogatories and
2 document request?
3    A.   Rephrase the question.
4    Q.   Were you asked by your lawyer
5 to look for documents in response to our
6 document request?
7    A.   Yes.
8    Q.   And did you look for notes?
9 Did you come across any notes from the
10 meeting you had that your wife had taken?
11    A.   I don't remember.
12    Q.   So you don't know whether she
13 may have notes from that conversation or
14 not?
15    A.   I don't.
16    Q.   Did you ask her whether she
17 has notes from that conversation?
18    A.   I don't remember.
19    Q.   You didn't ask her?
20    A.   I don't remember.
21    Q.   You don't remember if you
22 asked her.  You have to ask her.  Okay?
23       MS. BILENKER:  Mr. Aber, I
24    request that Mr. McCants ask his

Jeffrey McCants

Page 78

1  wife for notes she took during that
2  May 31 meeting with Joe Gallagher
3  and Mike Stief.
4       MR. ABER: So far, I've given
5  you everything.
6       MS. BILENKER: He just
7  testified he didn't recall asking
8  her. I want him to ask her. I want
9  those notes because we have reason
10  to believe they exist.
11       MR. ABER: If they're there
12  and they're appropriate, we'll
13  produce them.
14       MS. BILENKER: Thank you.
15  BY MS. BILENKER:
16       Q.   Is there anything else you
17  want to tell me further about that
18  conversation?
19       A.   At that meeting, Mr. Joe
20  Gallagher mentioned that he talked to the
21  staff, stating that he spoke with employees
22  at 811 in reference to my conduct as a
23  manager, stating that it was said that I
24  was a nice guy, but a crappy manager.

Page 79

1       Q.   He used that word crappy?
2       A.   It was something -- I don't
3  know if that was the exact word, crappy,
4  something stating either lousy or crappy
5  manager. Nice guy, but lousy or crappy. I
6  don't remember the exact word. And this
7  was -- which I never knew anything about
8  until that meeting. It was brought to my
9  attention at that meeting after he told me
10  about 801.
11       Q.   So it's your testimony the
12  first time you learned about the discontent
13  among your staff was at that May 31
14  meeting?
15       A.   Yes.
16       Q.   Anything else you want to tell
17  me about that conversation that was
18  discussed? Do you recall?
19       A.   No.
20       Q.   The time period between the
21  two meetings, the May 22 meeting and the
22  May 31 meeting, that week or so, did you
23  have any conversation with your wife about
24  the demotion?

Page 80

1       A.   I don't remember.
2       Q.   You don't remember her perhaps
3  changing your mind about the situation,
4  that she didn't think it was a good idea
5  for you to step down to assistant manager?
6       A.   I don't remember.
7       Q.   Is there anything else about
8  that meeting that you recall was discussed?
9       A.   No. Is it okay if I stretch
10  my legs?
11       MR. ABER: Do you want to take
12  a five-minute break?
13       MS. BILENKER: Sure.
14       - - -
15       (Whereupon, there was a
16  recess in the proceedings.)
17       - - -
18  BY MS. BILENKER:
19       Q.   I think where we were, Mr.
20  McCants, we were discussing the
21  face-to-face meeting you had with Joe
22  Gallagher and Mike Stief on or about May
23  31, 2002, which they again notified you
24  about the demotion; correct? That's where

Page 81

1  we were. Bring us back there. Okay? Yes?
2       A.   Yes.
3       Q.   I believe I asked you if there
4  was anything else you could remember about
5  the conversation, and you said no, we've
6  covered everything that you can recall
7  about that conversation?
8       A.   I'm sure there were other
9  things said, but I don't remember
10  everything.
11       Q.   Do you remember anything
12  else? Because now is your opportunity to
13  tell me.
14       A.   No.
15       Q.   Why do you think you were
16  demoted?
17       A.   I don't know.
18       Q.   Do you think it was because of
19  your race?
20       A.   I believe it was a
21  continuance. It all started with not
22  getting the gas store promotion and when I
23  expressed my concern to Mr. Poplawski about
24  lack of diversity, I think it was a

21 (Pages 78 to 81)

Page 82

1  continuum.
2      Q.   Why didn't they demote you
3  right after you complained?  Why did they
4  wait until May?
5      A.   I don't know.
6      Q.   You're saying that you believe
7  your demotion was the direct result of your
8  comment you made to Mr. Poplawski about a
9  lack of diversity?
10     A.   Yes.
11     Q.   Anything else?  Any other
12 reason why you believe you were demoted?
13     A.   No.
14     Q.   Are you claiming religious
15 discrimination in this case?  Are you
16 claiming that Wawa discriminated against
17 you because of your religion?  Are you
18 claiming that your demotion -- that Wawa
19 demoted you because of your religion?
20     A.   In addition to the comment or
21 in addition to me asking Mr. John Poplawski
22 about lack of diversity, there was also a
23 comment made by Mr. Joe Gallagher that I
24 didn't work on Sunday because I did the

Page 83

1  church thing.  So I believe it was a
2  continuance of the lack of the diversity
3  question.  It was an ongoing thing starting
4  with lack of diversity and next the
5  question about -- the next comment about
6  church.
7      Q.   Let me back up.  Are you
8  claiming that the reason you were demoted
9  is because of your religion?
10     A.   Race.
11     Q.   And what is your basis for
12 saying that it's race?
13     A.   When store 840 was posted, and
14 the managers that interviewed for that
15 store -- it was said to me by John
16 Poplawski that whenever there is a gas
17 store posting, all managers who want to
18 interview for the store can.  Store 840 was
19 awarded to George Sheldton.  George
20 Sheldton came from 841, where he was
21 already a gas store manager.  At that time
22 when George was awarded store 840, 841
23 became available.  No one interviewed for
24 that store.  Chris Casey was manager at

Page 84

1  store 842.  He was given store -- gas store
2  841, white manager, without being
3  interviewed.  Tom, who is the store manager
4  at 811, was given store 842 without being
5  interviewed, and I was transferred to store
6  811.
7      Q.   Okay.
8      A.   Race.
9      Q.   What --
10     A.   White manager was awarded the
11 gas store again without being interviewed.
12     Q.   Because of race?
13     A.   Yes.
14     Q.   What is your basis for saying
15 that the reason he was awarded 841 was
16 because of race?
17     A.   Yes.  It had to be race
18 because I didn't get store 840.  It was
19 awarded to a white -- a Caucasian, and then
20 I was told that all gas stores, all
21 managers interviewed for it, and I did not
22 receive an interview for that store.  It
23 was awarded to a Caucasian.
24     Q.   Was anyone else interviewed

Page 85

1  for that store?
2      A.   Which store?
3      Q.   For 841.
4      A.   No.
5      Q.   So how were you treated
6  differently?
7      A.   I was told that all managers
8  who are eligible to interview will
9  interview.  And I didn't interview.
10     Q.   You interviewed for store 840?
11     A.   Right.  Which I was qualified
12 for and I didn't get.
13     Q.   We've established that you
14 don't know any of the qualifications of the
15 person who got that job over you?
16     A.   I don't know their
17 qualifications.  I know my qualifications.
18     Q.   How did you know store 840
19 became vacant?  It was posted; right?
20     A.   That's correct.
21     Q.   And the reason it became
22 vacant was because a manager there went to
23 another job at Wawa; right?  Joann Jackson;
24 right?

Jeffrey McCants

Page 86

1    A.   Rephrase the question.
2    Q.   Isn't it true that the vacancy
3  at 840 posted because the manager there
4  went on to a different job at Wawa?
5    A.   What was the name of the
6  manager?
7    Q.   Joann Jackson. Didn't you
8  work under her at 840? Didn't she train
9  you? You don't recall if Joann Jackson
10  trained you at Wawa?
11    A.   Joann Jackson. Joann Jackson
12  was the manager before George Sheldton.
13    Q.   So she went to a different job
14  at Wawa and there was vacancy at 840;
15  correct?
16    A.   Yes.
17    Q.   Everybody interviewed for the
18  vacancy at 840? You just explained that
19  George Sheldton got that job and left an
20  opening at 841?
21    A.   Yes.
22    Q.   Nobody interviewed for the job
23  at 841; right? Everybody just got bumped
24  up; isn't that true?

Page 87

1    A.   Based on my conversation with
2  John Poplawski, when gas stores become
3  available, you can interview for the gas
4  store. 841 came available and I did not
5  receive an interview for gas store 841.
6    Q.   And nobody interviewed for
7  841; correct?
8    A.   I don't know that.
9    Q.   So you don't know if anybody
10  was interviewed or not? Same question.
11    A.   No.
12    Q.   The individual who got 841 you
13  testified was Chris Casey?
14    A.   Yes.
15    Q.   Do you know if you were more
16  qualified or less qualified or equally
17  qualified than Chris Casey?
18    A.   I don't know Chris Casey's
19  qualifications.
20    Q.   Isn't it true that 840 was a
21  number 1 store at the time in Wawa? It was
22  a very high-volume store?
23    A.   It's a high-volume store. I
24  don't know if it was number 1.

Page 88

1    Q.   What store were you working in
2  at the time?
3    A.   At the time of what?
4    Q.   You interviewed for 840.
5    A.   825.
6    Q.   What was your store ranked at
7  Wawa?
8    A.   Ranked as far as?
9    Q.   Out of the 500 stores at
10  Wawa.
11    A.   I don't know.
12    Q.   Would you agree it was 415 out
13  of 500?
14    A.   I don't know.
15    Q.   You don't know what the store
16  was ranked?
17    A.   No.
18    Q.   How long had you been managing
19  825 at the time?
20    A.   I believe close to a year.
21    Q.   Would you say it's more
22  difficult or less difficult or equally
23  difficult to manage a gas store at Wawa
24  versus a regular store without gas?

Page 89

1    A.   Repeat that.
2    Q.   Is it harder to manage a gas
3  store than a regular store without gas at
4  Wawa?
5    A.   It's more responsibility on
6  you to manage.
7    Q.   You supervise more people?
8    A.   It's --
9    Q.   True? You supervise more
10  people?
11    A.   It's more responsibility.
12  You --
13    Q.   Go ahead.
14    A.   It's more responsibility on
15  you to manage a gas store.
16    Q.   When you didn't get the gas
17  store job, Mr. McCants, did you file a
18  grievance?
19    A.   No.
20    Q.   Why not?
21    A.   I don't know.
22    Q.   I'm going show you another
23  document.
24        - - -

23 (Pages 86 to 89)

A-13

Jeffrey McCants

Page 98

1   Q.   Did you do that on a regular
2  basis?
3     A.   Yes.
4     Q.   If a store associate
5  complained that you didn't do that, would
6  they be lying?
7     A.   Yes.
8     Q.   If three store associates
9  claim that you didn't do that, would the
10 three of them be lying?
11    A.   Yes.
12    Q.   How about work with FSM?  What
13 does that mean?
14    A.   Food service manager.
15    Q.   How would you work with the
16 FSM?
17    A.   Make sure ordering -- our
18 ordering was correct.  Make sure that
19 spoilage -- we were controlling spoilage.
20    Q.   Did you do that --
21    A.   Sanitation.  Deli service.
22 And training.
23    Q.   Did you do that at 825?
24    A.   Yes.

Page 99

1     Q.   You think you did that
2  successfully at 825?
3     A.   Yes.
4     Q.   What does get cash in check
5  mean?
6     A.   Cash is part of shrink,
7  inventory loss, and control, making sure
8  that the tills are not above -- we're
9  supposed to have -- if I remember
10 correctly, $95 in cash in the till.  If you
11 go above that, it's not a good thing
12 because customers, when they see you open
13 up the register, they see a lot of money in
14 there.  When employees log off their
15 registers, make sure -- look at the over
16 and under of the day and deposits.
17    Q.   Do you think you had that
18 under control at 825?
19    A.   For the most part, I did.  I
20 think a couple months, I didn't have it
21 under control.
22    Q.   How about getting labor
23 dollars on track?  What does that mean?
24    A.   There was a certain percentage

Page 100

1  for your store that you couldn't go above,
2  what was budgeted for that store as far as
3  labor.
4     Q.   What was --
5     A.   And I believe that was --
6  might have been, if I remember correctly,
7  39 percent.
8     Q.   What is watch the use of
9  03/04/08 hours?
10    A.   That was assigned to the
11 associates.  03, if I remember correctly,
12 is management.  04 was associates.  08 was
13 training.
14    Q.   How about watch purchases -
15 internal and external?  Customers?
16    A.   No.  That was based on your
17 vendors.  When we place our orders through
18 the computer system other when you assign
19 somebody to do your orders, make sure
20 they're ordering properly for the store,
21 and then you had to watch for the vendors
22 that did their own -- came in and gave you
23 an account of what they thought you needed
24 in your store.

Page 101

1     Q.   Did you enter the invoices
2  from those vendors properly?
3     A.   Yes.
4     Q.   Did you ever have issues with
5  respect to those?  In other words, you
6  didn't enter them properly all the time?
7     A.   There was a couple times, yes,
8  I had problems, you know.  A certain
9  product wasn't in the system and we had to
10 find out why we got a new product and it
11 wasn't in the system.  So I had problems
12 like that; yes.
13    Q.   What about your Patco Score?
14 Increase Patco Score.  How would you do
15 that?
16    A.   That came with operations.  If
17 everybody -- it had to do with cleanliness
18 of the store.  Making sure dates were
19 correct on your product.  First in, first
20 out.  Just making sure everyone did their
21 job concerning Patco.
22    Q.   You had low Patco scores in
23 825; isn't that true?
24    A.   I don't remember all the

26 (Pages 98 to 101)

Jeffrey McCants

Page 102

1  scores.
2      Q.   They weren't high.  They were
3  low.  You don't recall?
4      A.   No.
5      Q.   You don't recall having issues
6  with respect to Patco in store 825?
7      A.   No.
8      Q.   How were you going to develop
9  your staff, which is the next line?
10     A.   First with management, making
11  sure management took the assigned classes
12  that were posted on the computer system.
13  Work one-on-one with them in training,
14  empowerment.
15     Q.   Did you do that in 825?
16     A.   Yes.
17     Q.   You think you did that in 825?
18     A.   Yes.
19     Q.   Why did you think you were
20  qualified to manage 840?
21     A.   I worked at the MIT at 840
22  under Joann Jackson.
23     Q.   You never managed a gas store
24  on your own did you?

Page 103

1      A.   No.
2      Q.   George Sheldton had, or you
3  don't know?
4      A.   Yes.  He managed store 841.
5      Q.   He came from 841?
6      A.   Uh-huh.
7      Q.   And Chris Casey had managed a
8  gas store, too; isn't that correct?
9      A.   I believe so.
10     Q.   Isn't it true you don't know
11  how the other applicants did in their
12  interviews for 840?
13     A.   No.
14     Q.   It's not true or it's true,
15  you don't know?
16     A.   I don't know how they did --
17     Q.   And you haven't —
18     A.   I don't know.
19     Q.   You didn't see their business
20  plans?  Or did you?
21     A.   No.
22     Q.   So you don't know the basis
23  for Wawa's decision in choosing other
24  candidates over you to manage the gas

Page 104

1  stores at issue; isn't that true?
2      A.   I would like to believe it was
3  based on credentials.
4      Q.   And you don't know which
5  credentials Wawa valued over others;
6  correct?
7      A.   No.
8      Q.   Now instead of getting 840 or
9  841, you went to 811; right?  Store 811?
10     A.   Yes.
11     Q.   Or 825.  And that was still a
12  promotion; correct?
13     A.   Yes.
14     Q.   I want to turn back to your
15  Complaint, Mr. McCants.  I think we were on
16  allegation 13.  Well, I think where we were
17  was I was asking you whether you were
18  bringing a religious discrimination claim.
19  I think you said -- you didn't say yes or
20  no, but you said you believe it's because
21  of your race that you didn't get the
22  promotion and that you were demoted.
23  Correct me if I'm wrong, and I want to be
24  sure I know what you're alleging.  So

Page 105

1  you're saying the reason you didn't get the
2  promotion was because of race?
3      A.   Yes.  Because when I asked Mr.
4  Poplawski about lack of diversity, I
5  believe I was targeted at that point.  Even
6  when I got to the promotion to 811, I think
7  it was just to pacify me.  And I am well
8  aware that when a manager goes from store
9  to store, the supervisor that's going to be
10  responsible for him, they are well aware of
11  the person they're getting.  And I believe
12  when it fell into Mr. Joe Gallagher's
13  hands, it was a continuation from me asking
14  the question about lack of diversity.  And
15  they maybe thought I was going to be a
16  problem, which I wasn't.  And that's where
17  the continuation of the church
18  comment. . .
19     Q.   That was the first comment.
20  There was another comment?
21     A.   No.  The church comment was
22  from Mr. Joe Gallagher.  So I believe I was
23  getting set up to be forced out.
24     Q.   So you are bringing a

27 (Pages 102 to 105)

Jeffrey McCants

Page 106

1  religious discrimination claim?
2      A.  Yes.
3      Q.  What other evidence do you
4  have that you were discriminated against on
5  the basis of your religion aside from the
6  comment that you allege Joe Gallagher made?
7      A.  That's it.
8      Q.  So if you look at paragraph
9  13, which says, one of the reasons for the
10  retaliatory actions taken was that you
11  didn't have commitment because you refused
12  to work Sundays, because you attended
13  church on Sundays, what's the basis for
14  that allegation?  Did Wawa ever tell you
15  you have to work Sunday?
16      A.  No.
17      Q.  What is the basis for that
18  allegation?
19      A.  My commitment.
20      Q.  What about your commitment?
21      A.  There was a concern about my
22  commitment.  That's when the Sunday came
23  up, that I didn't work Sundays because I
24  did the church thing, which I did --

Page 107

1      Q.  You did work Sundays?
2      A.  -- work Sundays.
3      Q.  So what was the issue?  What
4  was the issue?
5      A.  The issue is:  Why was the
6  comment made?
7      Q.  Anything else regarding the
8  discrimination on the basis of religion
9  that you want to explain?  Is there any --
10  I think it's been asked and answered.  I
11  asked you if there was anything else and
12  you said it was a comment and there was
13  nothing else you could recall at Wawa --
14  that would give you the basis for thinking
15  Wawa discriminated against you was on the
16  basis of your religion?
17      A.  No.
18      Q.  Did you ever file a grievance
19  with Wawa claiming religious
20  discrimination?
21      A.  Not with Wawa.
22      Q.  Did you ever file a claim --
23      A.  The labor --
24      Q.  -- with somebody else?

Page 108

1      A.  Department of Labor.
2      Q.  Your charge?
3      A.  Yes.
4      Q.  I'm talking about a grievance
5  within Wawa.
6      A.  No.
7      Q.  You're aware of the grievance
8  procedures at Wawa; correct?
9      A.  No.
10      Q.  You didn't know that Wawa had
11  an internal grievance procedure?
12      A.  No.
13      Q.  As a manager, you weren't
14  aware of that?
15      A.  No.
16      Q.  Did you get the employee
17  handbook at Wawa when you worked at Wawa?
18  Did you get the policies and procedures
19  handbook when you joined Wawa?
20      A.  Don't remember.
21      Q.  Did you ever see the policies
22  and procedures handbook while you worked
23  for Wawa?
24      A.  Don't remember.

Page 109

1      Q.  I want to go back to your
2  meeting that we said was on around May 21
3  or 22 with Mr. Gallagher when you were
4  notified you were being demoted.  Why do
5  you think Wawa chose to demote you and not
6  terminate you?
7      MR. ABER:  Objection.
8      THE WITNESS:  I don't know.
9  BY MS. BILENKER:
10      Q.  Did they explain the reason
11  for demoting you would be to help retrain
12  you in certain aspects of your job so that
13  you could later become a manager?  You
14  could become a manager again?
15      A.  No.
16      Q.  They never explained that to
17  you?
18      A.  No.
19      Q.  Isn't it true in that
20  conversation you expressed some interest
21  about other jobs within Wawa outside of the
22  store?
23      A.  I know I expressed interest to
24  Mike Stief about going to corporate --

28 (Pages 106 to 109)

Jeffrey McCants

Page 110

1    Q.   How come --
2    A.   -- when he came on as our -- I
3  believe it's area manager or area
4  supervisor.
5    Q.   How come you never pursued
6  that interest?
7    A.   Well, I believe at the time
8  that I -- that you had to go through being
9  a gas store manager.
10    Q.   You thought you had to be a
11  gas store manager in order to get a
12  corporate position at Wawa headquarters?
13    A.   Yes.
14    Q.   And what do you base that
15  belief on?
16    A.   I don't know, but that was my
17  belief, that you had to go through the
18  ranks of being in the field before you go
19  to corporate.
20    Q.   Isn't it true that your
21  supervisors made it known that you could
22  have -- they would help you explore other
23  opportunities within Wawa?
24    A.   No.

Page 111

1    Q.   Weren't you getting experience
2  in the field as being a store manager of a
3  non-gas store?  I don't quite understand
4  the logic that you thought you had to be a
5  gas store manager to get a corporate job.
6    A.   I just heard that.  I thought
7  that was the way to go.
8    Q.   Who did you hear that from?
9    A.   I don't remember who I heard
10  it from, but I thought that's the way to
11  go.  In order to get in corporate, you had
12  to go through being a gas store manager
13  first.
14    Q.   Did you ever get that
15  confirmed by your supervisors?
16    A.   No.
17    Q.   You never asked?
18    A.   No.
19    Q.   When did you discuss salary,
20  the details about what your salary would be
21  as an assistant manager after you were
22  demoted?
23    A.   I believe at the meeting with
24  Mike Stief, I was told about the demotion

Page 112

1  and what assistant managers get paid.
2    Q.   Did you ask about what your
3  salary was going to be?
4    A.   No.
5    Q.   Did they tell you what your
6  salary was going to be?
7    A.   Don't remember, but assistant
8  managers -- I'm a manager, and I'd like to
9  think if you're a manager, assistant
10  manager is going to make less than a
11  manager.
12    Q.   Were you concerned about that?
13    A.   Yes.
14    Q.   But you didn't ask about it?
15    A.   Don't remember.
16    Q.   You don't remember at all
17  discussing what your salary was going to
18  be?  That's your testimony?
19    A.   I don't remember asking.
20    Q.   Did you take any notes during
21  those meetings?  I'm talking about the
22  first meeting with Mr. Gallagher.
23    A.   No.
24    Q.   You didn't take any notes

Page 113

1  during the second meeting with Mr.
2  Gallagher and Mr. Stief?
3    A.   No.
4    Q.   Did you ever talk about -- now
5  we're going to the second meeting with Mr.
6  Gallagher and Mr. Stief.  Did you ever talk
7  about what standards of performance are?
8    A.   No.
9    Q.   Did Mr. Gallagher and Mr.
10  Stief ask you or tell you how long you had
11  to think about the decision?  Did they give
12  you an idea when you should contact them
13  about your decision, whether you were going
14  to accept a demotion or resign, or
15  something else?
16    A.   No.
17    Q.   So the next time you contacted
18  Wawa was in August.  You left a voicemail
19  message for Mr. Stief?  Does that sound
20  right?
21    A.   I left a voicemail for Mr.
22  Stief. I don't know when it was.
23    Q.   It was at least a month
24  later.  Does that sound right?

Jeffrey McCants

Page 114

1    A.   I don't remember the time.
2    Q.   Do you know when your official
3  resignation date was?
4    A.   No.
5    Q.   Does August 12 sound right?
6    A.   I don't know.
7    Q.   You don't recall being very
8  specific to Mr. Stief's voicemail that you
9  wanted August 12 to be the resignation
10  date?
11    A.   No.
12    Q.   After that meeting, did you
13  apply for workers' comp?
14    A.   I applied for workmen's comp.
15  I don't know if that was the date.
16    Q.   After the meeting, you applied
17  for workers' comp?
18    A.   I don't know if that was the
19  date. I applied for it, but I don't know
20  if that was the date.
21    Q.   I'm not giving you the date.
22  I'm saying, after you met with them
23  regarding the demotion, regarding the
24  assistant manager position —

Page 115

1    A.   I applied for workmen's comp
2  but I don't know when.
3    Q.   Did you also apply for
4  short-term disability?
5    A.   Yes.
6    Q.   And you collected short-term
7  disability?
8    A.   Yes.
9    Q.   For how long?
10    A.   I don't know.
11    Q.   Isn't it true you were still
12  collecting short-term disability from Wawa
13  and you'd already started another job with
14  Elite?
15    A.   Don't remember.
16    Q.   Mr. McCants, you testified
17  that the reasons the company gave you for
18  having — for demoting you to assistant
19  manager were performance-related; right?
20  They said the financial statement and the
21  low morale were the two reasons you said
22  they gave you?
23    A.   Uh-huh.
24    Q.   Let's say the company believed

Page 116

1  that was true, had an honest belief that
2  was true. Would it be reasonable for them
3  to demote you?
4    MR. ABER:  Objection.
5    MS. BILENKER:  You can
6  answer.
7    THE WITNESS:  Repeat the
8  question.
9  BY MS. BILENKER:
10    Q.   If Wawa had an honest belief
11  that the reasons that they needed to demote
12  you was that you had a troubled financial
13  statement or your financials in the store
14  weren't good or the morale was really
15  problematic in your store, would it be
16  reasonable for Wawa to demote you?
17    A.   In the meeting with Mr. Joe
18  Gallagher and Mr. Mike Stief, up until that
19  meeting, I had no proof of anything.
20  Morale, troubled statement, anything of
21  that nature.
22    Q.   What was the last grade of
23  school that you completed?
24    A.   School? High school or

Page 117

1  college?
2    Q.   Start with high school.
3    A.   12th.
4    Q.   You graduated high school?
5    A.   Yes.
6    Q.   Did you graduate from college?
7    A.   Some college.
8    Q.   So you didn't graduate —
9    A.   No.
10    Q.   — from college? How much
11  college did you attend?
12    A.   Three years.
13    Q.   Why didn't you graduate?
14    A.   I left for personal reasons.
15    Q.   What were those reasons?
16    A.   I left for personal reasons.
17    Q.   And I'm asking you: What were
18  those reasons?
19    A.   I left for personal reasons.
20    Q.   I'm asking you: What were the
21  personal reasons you left?
22    A.   Family.
23    Q.   What about your family?
24    A.   Sickness.

Jeffrey McCants

Page 122

1　Productions?
2　　　A.　No.
3　　　Q.　Did you ever work at
4　McDonald's?
5　　　A.　Don't remember.
6　　　Q.　You don't remember whether you
7　ever worked for McDonald's or not?
8　　　A.　No; I never worked for
9　McDonald's.
10　　　Q.　While you were a student at
11　Widener, you indicate here on the
12　application that you worked for
13　McDonald's. Are you saying that that's not
14　true?
15　　　A.　That's not true.
16　　　Q.　Why would it indicate that you
17　worked for McDonald's if you never worked
18　for McDonald's?
19　　　A.　I don't know.
20　　　Q.　And why would it indicate that
21　you worked for Wawa if you didn't work for
22　Wawa?
23　　　A.　I don't know.
24　　　Q.　Who took this information down

Page 123

1　for this application? Who did you speak to
2　at Guardsmark about the job that you were
3　applying for?
4　　　A.　I don't remember.
5　　　MS. BILENKER: Let's go off
6　the record.
7　　　　- - -
8　　　(Whereupon, an off-the-record
9　discussion was held.)
10　　　　- - -
11　BY MS. BILENKER:
12　　　Q.　Where did you work before you
13　worked for M. Charles Productions?
14　　　A.　I don't remember.
15　　　Q.　After you worked at M. Charles
16　Productions, you applied for a job with
17　Wawa; correct?
18　　　A.　Yes.
19　　　Q.　And you allege in the
20　complaint it was about October, '97?
21　　　A.　Yes.
22　　　Q.　Who hired you?
23　　　A.　Rick Downes.
24　　　Q.　How did you come to apply for

Page 124

1　Wawa? Did you see an ad in the paper? Did
2　you go on the internet?
3　　　A.　Ad in the paper.
4　　　Q.　What was it an ad for? Was it
5　a managerial position? An associate
6　position? Assistant manager position?
7　Where did you want to work at Wawa?
8　　　A.　Repeat that please.
9　　　Q.　Where did you want to work
10　within Wawa?
11　　　A.　Where did I want to work at
12　Wawa?
13　　　Q.　At the time you applied?
14　　　A.　Management.
15　　　Q.　Did you want to work in a
16　store? Did you want to work in HR? Did
17　you want to work in corporate?
18　　　A.　Store.
19　　　Q.　Did you, in fact, get the job?
20　　　A.　Yes.
21　　　Q.　And what was your first
22　position in Wawa?
23　　　A.　I believe it was assistant
24　manager.

Page 125

1　　　　- - -
2　　　(Whereupon, Exhibit McCants-6 was
3　marked for identification.)
4　　　　- - -
5　BY MS. BILENKER:
6　　　Q.　Is this your job application
7　for Wawa? Is this your handwriting?
8　　　A.　Yes.
9　　　Q.　Is that your signature on the
10　second page?
11　　　A.　Yes.
12　　　Q.　And it's dated October 21,
13　1997?
14　　　A.　Yes.
15　　　Q.　So you were hired as an
16　assistant manager. Did it come to a point
17　when you joined the manager-in-training
18　program?
19　　　A.　Yes.
20　　　Q.　And what did you understand
21　that program to be?
22　　　A.　Manager in training.
23　　　Q.　So you were going to train for
24　some period of time under a manager to

32 (Pages 122 to 125)

Jeffrey McCants

Page 126

1  eventually become a manager yourself?
2      A.   Yes.
3      Q.   And I think you testified you
4  agreed that you trained under Joann
5  Jackson; is that right?
6      A.   Yes.
7      Q.   And that was in store 840?
8      A.   I worked with Joann at 816,
9  too.
10     Q.   Then there came a time when
11 you were promoted to a manager?
12     A.   Yes.
13     Q.   Would that sound right if I
14 were to say that was in the fall of 2000?
15     A.   Yes.
16     Q.   Which store were you
17 managing?  What was your first store that
18 you managed?
19     A.   825.
20     Q.   Who did you report to?
21     A.   Rick Downes.
22     Q.   Did there come a point when
23 you began reporting to John Poplawski?
24     A.   Yes.

Page 128

1      Q.   And what is his name?
2      A.   Julian McCants.
3      Q.   What occasion did Wawa have to
4  take these pictures?
5      A.   Recruitment.
6      Q.   What about recruitment?
7      A.   Mr. Rick Downes asked me if I
8  would participate in a recruitment poster.
9      Q.   What was your reaction?
10     A.   I said yes.
11     Q.   What did it involve?  What did
12 you have to do as part of the recruitment
13 campaign?
14     A.   Take pictures.
15     Q.   Why do you think Wawa asked
16 you to be depicted on their recruitment
17 campaign poster?
18     A.   I don't know.
19     Q.   Did you consider it an honor?
20     A.   I don't know.
21     Q.   How many associates reported
22 to you at 825?
23     A.   I believe it was 20 to 25.
24     Q.   How would you describe

Page 127

1      Q.   How soon after you assumed the
2  manager position at 825 did you begin
3  reporting to John Poplawski?
4      A.   I don't remember.
5      Q.   Did you and Rick Downes have a
6  good relationship?
7      A.   I'd like to think so.
8      Q.   Did you and John Poplawski
9  have a good relationship?
10     A.   I'd like to think so.
11
12         (Whereupon, Exhibits McCants-7
13     and McCants-8 were marked for
14     identification.)
15              - - -
16 BY MS. BILENKER:
17     Q.   These are photographs of you,
18 Mr. McCants.  The first document, No. 7, is
19 a document that Wawa has.  And the second
20 document, No. 8, is a document that you
21 produced, a couple pages that you produced,
22 which are pictures of what?  Who was with
23 you in these pictures?
24     A.   My son.

Page 129

1  yourself as a manager at 825?  How do you
2  feel you performed as a manager?
3      A.   My first year?  It was my
4  first store manager job, first year.  I
5  believe I did pretty well.  Above average.
6      Q.   Well, your first year, you
7  were only in the store a little over a
8  year; right?  Before you went on to 811;
9  isn't that right?
10     A.   Repeat that please.
11     Q.   You really were only managing
12 825 for about a year before you were
13 promoted to 811; isn't that right?  It's
14 2001.
15     A.   It was anywhere from nine
16 months to a year, I believe.
17     Q.   So you believe you performed
18 above average in that year?
19     A.   Based on my evaluation.  Based
20 on 1, 2, 3, 3 being the highest, I was
21 evaluated at 2-1/2.
22     Q.   Why don't we talk about your
23 evaluation.
24              - - -

33 (Pages 126 to 129)

Jeffrey McCants

Page 150

1    A.   Yes.
2    Q.   My question is:  After you got
3  this write-up, did you start working the
4  requisite 46.75 hours per week; yes or no?
5    A.   Yes.
6    Q.   Is it your testimony that your
7  time clock, the time records would indicate
8  that?
9    A.   It should.
10   Q.   And if they didn't?
11   A.   I don't know if they didn't.
12   Q.   Did you ever go back to the
13  system and edit your time to reflect the
14  46.75 hours when you, in fact, hadn't
15  worked 46.75 hours?
16   A.   No.
17   Q.   Did you do any other editing
18  of your hours going into the system and
19  changing hours that you worked?
20   A.   The only time I did editing is
21  if I didn't clock in or the system was
22  down.
23   Q.   Did you ever work more than 50
24  hours a week?

Page 151

1    A.   I don't remember.
2    Q.   Did you ever put in very long
3  hours in your job managing 811?  Did you
4  ever work — well, you don't remember if
5  you worked more than 50 hours a week.  Did
6  you ever work 100 hours a week?
7    A.   No.
8    Q.   Did you ever work 80 hours a
9  week?
10   A.   No.
11   Q.   It's not unusual for managers
12  to work those kind of hours; isn't that
13  true?
14   A.   I don't know.
15   Q.   Going back to when you managed
16  825, did you have a shrinkage problem at
17  that store?
18   A.   Don't remember.
19   Q.   Would it be out of the
20  question if you did?  If I told you you had
21  a shrinkage problem at that store, would
22  you disagree with that emphatically?
23   A.   It's a possibility because the
24  type of store we run, we can have shrinkage

Page 152

1  problems.
2    Q.   What if you had an excessive
3  shrinkage problem?  Would you disagree with
4  that?
5    A.   I don't remember.
6    Q.   When you moved to 811 in
7  November, '01, this is after you didn't get
8  the promotion, were you glad?
9    A.   Glad what?
10   Q.   Were you glad you got that
11  store —
12   A.   No.
13   Q.   — 811?  You didn't want to be
14  in 811?
15   A.   I was going for store 840, the
16  gas store.
17   Q.   And you didn't get the gas
18  store, but you testified you did get
19  promoted to 811?
20   A.   Yes.
21   Q.   Did you want to stay in 825 or
22  were you glad to have gotten 811?
23   A.   I just kept working.
24   Q.   So the answer is no?

Page 153

1    A.   The answer is:  I kept
2  working.
3    Q.   Who worked for you at 811?
4  What were the names of your associates?
5    A.   Christy Mulholland.
6    Q.   She was your assistant
7  manager?
8    A.   Yes.  Sharon Young.
9    Q.   What was her job?
10   A.   I had two Sharons.  One was a
11  CSL.  The other one was a food service
12  manager.
13   Q.   Which one is Sharon Young?
14   A.   Food service manager.  I
15  believe the last name was Young.
16   Q.   The other Sharon had a sister
17  there.  The food service manager was
18  black.  Her name was Sharon.  And then the
19  other Sharon was white.  She had a sister
20  working there, too.
21   Q.   You don't remember their last
22  names?
23   A.   It's been a while.
24   Q.   Well, they did work for you

Love Court Reporting, Inc.                    **A-21**

Jeffrey McCants

Page 158

1  as your area supervisor?
2      A.   Say that again.
3      Q.   Joe Gallagher became your
4  supervisor after John Poplawski; correct?
5      A.   Yes.
6      Q.   And was that around January of
7  2002?
8      A.   Yes.
9      Q.   How would you characterize
10  your relationship with Joe Gallagher?
11      A.   Not good.
12      Q.   Why not?
13      A.   His style of supervision was a
14  bully tactic type of style, intimidating.
15  When things were wrong in the store, it was
16  my fault.  When they were correct, he took
17  credit.  He'd pull people from my staff
18  without letting me know.  When I asked are
19  there going to be any replacements, that's
20  your job.  Changed my schedule without
21  notifying me.  Degraded me in front of
22  customers.  Give me orders in front of the
23  staff.  Every time he came in there, it was
24  a situation where I had to prove myself

Page 160

1  being demoted at the time because of a
2  morale problem, well, when you take two of
3  my key people out of the store, there's
4  going to be a morale problem.
5      Q.   Anything else?
6      A.   I didn't feel any support.  I
7  always felt I was on my own.
8      Q.   Anything else?
9      A.   Before the no smoking policy
10  indoor act, if the associates talked to him
11  about a morale problem was -- we really
12  didn't have nowhere to smoke.  And I was
13  having health problems here, too, because I
14  would tell the staff the bathroom, we just
15  use bathroom to use the bathroom, you know,
16  for our bodily function.  Not to smoke.
17  Because there is non-smokers in the store.
18  So I had to keep the non-smokers and the
19  smokers happy the best way I can.  That was
20  brought to his attention as I was being
21  hard.  Or when they have a policy that if
22  there's three or more people at the
23  register, you have to come out and help the
24  person that was ringing.  I would state

Page 159

1  where he would talk to the staff first and
2  then I was wrong, what they said was true,
3  and I always had to prove myself to him.
4  When I did the multi-store meeting, the
5  other managers came and said, you did a
6  great job conducting the meeting.  He says
7  a comment in front of them, oh, yeah, he
8  got to get his store together.  Very
9  intimidating.
10      Q.   Anything else?
11      A.   Never really spoke when he
12  came in the store, just gave directives the
13  moment he came in.  It was my way or the
14  highway type of supervising.
15      Q.   Anything else?
16      A.   When I did have problems with
17  associates, it was brought to his attention
18  but nothing was done.  That added to the
19  morale problem that they talked about.  And
20  that was with the food services manager.
21      Q.   So you were aware of a morale
22  problem before you left --
23      A.   No.  I was told after the fact
24  if they're claiming I'm being -- I was

Page 161

1  that to some of them, we need help, come on
2  over, trying to enforce that policy.  They
3  may have ran to Joe and said, oh, he's --
4  here's a morale problem because I'm asking
5  you to come over and help me with -- ring
6  up customers.
7      Q.   Because you were asking
8  associates --
9      A.   Yes.
10      Q.   -- to come help you ring up
11  customers --
12      A.   Yes.
13      Q.   -- and you were --
14      A.   Right.  The policy is, if I
15  remember correctly, if you have three or
16  more customers at the register, then they
17  were supposed to come over and help, no
18  matter who you are.  If you're a CSL, a
19  food service manager, an associate, you
20  come over to the register and help out.
21      Q.   And did you do that?
22      A.   Yes, I did.
23      Q.   So you're saying the morale
24  problem developed after you asked them to

41 (Pages 158 to 161)

Jeffrey McCants

Page 182

1    A.    No.
2    Q.    But this e-mail is addressed
3 to you; correct?
4    A.    Yes.
5    Q.    So did Joe Gallagher offer to
6 support you in rectifying the poor results
7 from the audit that Gail Skocik did of your
8 store?
9    A.    I don't remember.
10    Q.    Did Joe Gallagher create a
11 special cash rack for you for accommodating
12 your height? Did Joe approve that the
13 store that you worked in would be altered
14 to accommodate you for your height?
15    A.    Don't remember.
16    Q.    So you do not remember that?
17    A.    I don't remember.
18    Q.    Did Joe Gallagher go over
19 inventory loss with you, your paperwork and
20 the store?
21    A.    I don't remember.
22    Q.    Did Joe Gallagher visit your
23 store at least once a week?
24    A.    He visited the store. I don't

Page 183

1 know if it was once a week.
2    Q.    Did you have a pizza party in
3 your store for your associates at store
4 811?
5    A.    Yes.
6    Q.    Did Joe Gallagher approve that
7 party, for you to hold that party?
8    A.    Don't remember.
9    Q.    Why did you have the party?
10    A.    Safety.
11    Q.    What about safety?
12    A.    You had to go so many days
13 without having an incident.
14    Q.    And so this was to commend
15 your associates for not having any injuries
16 for a certain period of time?
17    A.    Yes.
18    Q.    Do you have any reason to
19 believe that Joe Gallagher wouldn't have
20 supported you having a pizza party for your
21 associates to commend them for a good
22 safety record?
23    MR. ABER: Objection.
24    THE WITNESS: I don't

Page 184

1 remember.
2 BY MS. BILENKER:
3    Q.    Where was this party?
4    MR. ABER: I think he just
5 testified he doesn't remember having
6 it.
7    MS. BILENKER: No. He said
8 that he does remember the pizza
9 party. He didn't remember getting
10 Joe's support for it.
11 BY MS. BILENKER:
12    Q.    Where was the pizza party, Mr.
13 McCants? Was it in the store or in a
14 restaurant?
15    MS. BILENKER: I want to say
16 something and just comment on the
17 record here that Mr. McCants take an
18 unreasonably long time answering
19 questions, and that's sort of the
20 delay here that he must take at
21 least 30 seconds, sometimes a
22 minute, to answer questions, simple
23 questions, and that's sort of what's
24 prolonging things here, Mr. Aber.

Page 185

1 So I want the record to reflect
2 that. These are simple questions.
3 Was the pizza party at the store or
4 in a restaurant or somewhere else?
5    THE WITNESS: I believe it
6 was outside the store.
7 BY MS. BILENKER:
8    Q.    Was it at Pizza Hut?
9    A.    I believe so.
10    Q.    Was Mr. Gallagher there?
11    A.    I believe so.
12        - - -
13    (Whereupon, Exhibit McCants-12
14 was marked for identification.)
15        - - -
16 BY MS. BILENKER:
17    Q.    I'm showing you an e-mail from
18 Joe Gallagher to you dated April 15, 2002.
19 Tell me when you're done reviewing it.
20    A.    Finished.
21    Q.    In this e-mail, doesn't it
22 show Mr. Gallagher notified you that store
23 associates who worked at 811 for you were
24 unhappy, that morale was not improving?

47 (Pages 182 to 185)

Page 186

1     A.   Based on this e-mail?
2     Q.   Yes.
3     A.   Yes.
4     Q.   You received this e-mail,
5   didn't you?  Are you denying that you
6   received this e-mail?
7     A.   I don't remember receiving it.
8     Q.   Well, it's a pretty important
9   e-mail.  It's notifying you that the morale
10  in your store is not improving.  That
11  associates are talking about leaving
12  because of you and that you are the one who
13  can turn it around.  Would you agree that
14  this is an important e-mail?
15    A.   It's important.
16    Q.   You don't recall getting it?
17    A.   No.
18    Q.   You don't recall any
19  discussions that you had with Mr. Gallagher
20  during the time that you managed 811 about
21  morale, about low morale in the store?
22    A.   I don't remember other than
23  the time we met on the 21st and the meeting
24  I had with Mr. Gallagher and Mr. Stief.

Page 187

1           - - -
2        (Whereupon, Exhibit McCants-13
3     was marked for identification.)
4           - - -
5   BY MS. BILENKER:
6     Q.   Do you know who Gail Skocik
7   is, Mr. McCants?
8     A.   Auditor.
9     Q.   She is an auditor for Wawa;
10  correct?
11    A.   Yes.
12    Q.   Did she offer you to
13  participate in the Adopt-A-Store Program at
14  Wawa?  Do you remember participating in
15  that program with her?
16    A.   No.
17    Q.   You don't recall that?
18    A.   No.
19    Q.   Do you know what the
20  Adopt-A-Store Program is at Wawa?
21    A.   The Adopt-A-Store Program.
22    Q.   Well, where Gail Skocik would
23  come into a store and go through a series
24  of questions and fact findings to find

Page 188

1   areas that you needed support and training
2   on in your store?
3     A.   No; I don't remember.
4     Q.   The program is really an
5   effort to help managers in their stores in
6   certain areas?  To help managers improve?
7   You don't recall the program at Wawa?
8     A.   No.
9     Q.   So this e-mail to you, you
10  don't recall getting where Miss Skocik
11  recommended and actually asked permission
12  from Joe Gallagher, which she got, to have
13  you participate in the program?
14    A.   No.
15    Q.   She set up a date with you
16  that was convenient for you to come into
17  the store and do an audit and review that
18  with you.  You don't recall that?  You
19  don't recall meeting with her at the store?
20    A.   I know she did an audit on the
21  store but I don't remember meeting with her
22  in reference to the Adopt-A-Store Program.
23    Q.   Well, if you don't focus on
24  what it was called, she did meet with you

Page 189

1   in your store; right?
2     A.   I believe she did an audit on
3   811.
4     Q.   And were you there during the
5   audit?
6     A.   I think so.
7     Q.   You don't recall sending dates
8   back to her as to what dates would work
9   well for her to come into the store to meet
10  with you to go over to review store
11  procedures and policies?
12    A.   I don't remember.
13    Q.   You don't recall that Gail
14  Skocik met with you at your store and the
15  dates you had scheduled her to come, you
16  were completely taken off guard and
17  surprised to see her?
18    A.   I don't remember.
19    Q.   You don't recall that she —
20  well, let's go back to what you do recall.
21  You recall her doing an audit with you in
22  your store; right?
23    A.   I believe it was her who did
24  the audit.

Page 190

1  Q.  Someone did an audit from Wawa
2  internally?
3  A.  Yes.
4  Q.  And went over various
5  procedures with you; right?
6  A.  Before the audit or after the
7  audit?
8  Q.  During the audit.
9  A.  No.
10  Q.  Before the audit?
11  A.  No.
12  Q.  After the audit?
13  A.  Yes.
14  Q.  So after the audit, someone
15  internally from Wawa came over and reviewed
16  procedures in the store with you?
17  A.  The audit itself?  Is that
18  what you're asking?
19  Q.  Yes.  I'm talking about when
20  you reviewed with Gail Skocik, but it may
21  be someone else internally at Wawa, you
22  believe it was Gail Skocik, where she
23  reviewed store procedures with you,
24  operating procedures?  She went over things

Page 191

1  with you in the store?
2  A.  Relating to the audit?
3  Q.  Relating to entering bills.
4  Related to writing off retail items.
5  Nothing?
6  A.  I think she mentioned
7  something about write-offs.
8  Q.  What about write-offs?  That
9  you weren't doing them correctly?
10  A.  Make sure that the store is
11  writing off food spoilage properly.
12  Q.  And did that -- was that
13  instructive for you?
14  A.  That's what she went over
15  after the audit.
16  Q.  I'm asking you:  Was that
17  instructive?  Was that helpful to have her
18  go over that with you?
19  A.  Yes.
20  Q.  Did she go over other things
21  with you, other discrepancies with you?
22  A.  Don't remember.
23  Q.  Do you remember anything else
24  she went over with you?

Page 192

1  A.  No.
2  Q.  Did you tell her you were
3  going to put together a plan with your
4  management team on implementing the
5  improvements that she went over with you?
6  A.  I don't remember.
7  Q.  So you never put together a
8  plan with your management team after
9  meeting with Gail Skocik?
10  A.  I don't remember.
11  Q.  Do you know who Sharon Young
12  is?
13  MR. ABER:  What was the last
14  name?
15  MS. BILENKER:  Sharon Young.
16  BY MS. BILENKER:
17  Q.  We talked about some Sharons.
18  Do you know Sharon Young?
19  A.  I believe that was the food
20  service manager.
21  Q.  Did you get along with her?
22  A.  In the beginning, as I stated
23  earlier, we would bang head-on on policy as
24  far as Sizzlis, putting Sizzlis out,

Page 193

1  because she's the food service manager, and
2  when to put them out and when to come over
3  and help at the register.
4  Q.  What time did you get into
5  work?
6  A.  I believe it was 6:00.
7  Q.  Is that considered the morning
8  rush at Wawa?  A lot of people in the
9  store?  A lot of customers?
10  A.  I believe so.
11  Q.  When you reported to work,
12  what did you do?  What was the first thing
13  you did when you got there?
14  A.  I did deposits or depends on
15  if there was -- if we had proper help.  If
16  we had proper help, I would do deposits.
17  If not, I would jump on the register.
18  Q.  Why wouldn't you have proper
19  help?
20  A.  If somebody called off.  If
21  somebody is running late.
22  Q.  What about if you were fully
23  staffed?  Would you jump on the register
24  then or --

Jeffrey McCants

Page 218

1  on?
2       MR. ABER:  Objection.
3  BY MS. BILENKER:
4       Q.    How about are there any other
5  symptoms that you can think of that you
6  believe are the result of your leaving
7  Wawa?
8       A.    I guess it would be paranoia
9  of upper management.
10      Q.    Can you explain what that
11  means?
12      A.    Trusting my superiors.
13      Q.    How are your superiors at your
14  current job?  What are they like?
15      A.    They're okay, but I still have
16  that paranoia because they're upper
17  management.
18      Q.    Do you trust them?
19      A.    Not fully.
20      Q.    Did they do something in
21  particular to make you not fully trust
22  them?
23      A.    No.
24      Q.    Did anyone ever make any

Page 219

1  racially discriminatory statements to you
2  while you worked for Wawa?
3       A.    When you say anybody.
4       Q.    Anybody.  Any employee.
5       A.    I can't recall.
6       Q.    Did you ever tell John
7  Poplawski that you felt you were the victim
8  of race discrimination?
9       A.    No.
10      Q.    Did you ever tell Joe
11  Gallagher that you felt you were the victim
12  of race discrimination?
13      A.    No.
14      Q.    How about Mike Stief?
15      A.    I don't remember.
16      Q.    How about Jim Shortall?
17      A.    I don't remember.
18      Q.    Did you ever tell John
19  Poplawski that you were the victim of
20  religious discrimination?
21      A.    No.
22      Q.    How about Joe Gallagher?
23      A.    I believe I mentioned it at
24  the last meeting I had with Mr. Gallagher

Page 220

1  and Mr. Stief.
2       Q.    What did you say?
3       A.    I just mentioned that a
4  comment was made.
5       Q.    Anything else?
6       A.    No.
7       Q.    You mentioned a comment was
8  made but you didn't say, I believe I might
9  have been discriminated against, or words
10  to that effect, that you were discriminated
11  against on the basis of your religion?
12      A.    No.  Just that the comment was
13  made.
14      Q.    And what was their response to
15  you repeating that comment?
16      A.    I don't remember.
17      Q.    Did you ever mention that you
18  are the victim of religious discrimination
19  to Jim Shortall?
20      A.    I don't recall.
21      Q.    Did you ever complain to
22  anybody else that you felt you were the
23  victim of religious discrimination?
24      A.    Outside of my attorney and the

Page 221

1  Department of Labor?
2       Q.    Yes.
3       A.    No.
4       Q.    How about outside your
5  attorney and the Department of Labor on
6  race?
7       A.    No.
8       Q.    Did you ever have an associate
9  who asked you whether he or she could file
10  a grievance under the Wawa grievance
11  policy?
12      A.    I don't recall.
13      Q.    Aside from the comment you
14  told us you made to John Poplawski about
15  lack of diversity, were there any other
16  comments that you made to anyone at Wawa
17  about what you perceived as unfair
18  treatment on the basis of race or religion?
19      A.    No.
20      Q.    Wouldn't being involved in
21  church, as you said you are, be a positive
22  attribute for a manager at Wawa?
23      A.    Yes.
24      Q.    Isn't it true that Wawa

56 (Pages 218 to 221)

Page 226

1  I can think of is it was a
2  performance issue. It's my
3  understanding that in order to get a
4  touch screen, your deli sales had to
5  be up. So me being demoted was --
6  if it was part of my performance,
7  that store was scheduled for touch
8  screen ordering, and I'd like to
9  believe it was only for stores that
10  reached a certain quota in deli
11  sales.
12      MR. ABER: We'll attach a copy
13  of these?
14      MS. BILENKER: Yes.
15  BY MS. BILENKER:
16      Q.  That has to do with the store
17  financials, getting touch screens?
18      A.  Deli sales.
19      Q.  Sales?
20      A.  Yeah; sales for deli.
21          - - -
22      (Whereupon, Exhibit McCants-15
23  was marked for identification.)
24          - - -

Page 227

1  BY MS. BILENKER:
2      Q.  Okay. In the Charge of
3  Discrimination that you filed in the EEOC
4  and the Delaware Department of Labor, I
5  think we went over most of this, but you do
6  allege at the bottom that other stores such
7  as 801 and 840 have the same issues,
8  meaning the same issues, I guess, as your
9  store, 811, but the white managers were not
10  demoted. What knowledge do you have that
11  the store managers at 801 or 840 were not
12  demoted? Do you have firsthand knowledge
13  about that?
14      A.  Well, at the time I was
15  demoted, these two managers had performance
16  and inventory problems and they were still
17  on board.
18      Q.  Did they have the same
19  inventory problems as your store? Do you
20  know?
21      A.  I don't know to what level,
22  but inventory problems are inventory
23  problems.
24      Q.  Did they have low morale

Page 228

1  problems?
2      A.  Usually with shrink, they have
3  morale problems.
4      Q.  Let's separate out inventory
5  problems. Do you know if these stores had
6  low morale problems aside from inventory
7  issues?
8      A.  Through the grapevine. Yeah.
9  Hearing in passing that associates were not
10  happy.
11      Q.  Which associates?
12      A.  Associates at store 801 and
13  840.
14      Q.  And where did you hear that?
15      A.  Through other associates I
16  used to work with at 840 and there was
17  associates like -- it was associates I
18  worked with at store 840.
19      Q.  And who were those associates?
20      A.  I can't remember the names.
21  They were associates or one associate -- it
22  was associates at store 801, but the one I
23  can remember was Robin Blanton, who used to
24  work at 801. She came to my store, which

Page 229

1  was 811 at the time.
2      Q.  And she's the associate who
3  resigned from your store?
4      A.  I don't know if she resigned
5  or not.
6      Q.  That's the same Robin Blanton
7  who worked for you --
8      A.  There was a Robin Blanton that
9  worked at store 811. I don't know if she
10  resigned or not.
11      Q.  You're talking about the Robin
12  Blanton who came from 801 to your store,
13  told you about morale issues in 801?
14      A.  Yes.
15      Q.  You don't know about them
16  firsthand. You know about them through
17  Robin Blanton?
18      A.  And inventory problems.
19      Q.  I'm just talking about
20  morale. I'm not talking about inventory
21  problems.
22      A.  Okay. Morale for 801? Yes;
23  through Robin Blanton.
24      Q.  Through anybody else or just

Jeffrey McCants

Page 230

1  through Robin Blanton?
2      A.   Which store?
3      Q.   801?
4      A.   Robin Blanton, store 801.  The
5  other associates, I don't remember.
6      Q.   You mean from 840 —
7      A.   No; 801.
8      Q.   So there are other associates
9  at 801 —
10     A.   Yes.
11     Q.   — who told you that 801 had a
12  morale problem, but you don't remember
13  their names?
14     A.   That's correct.
15     Q.   How about at 840?  You also
16  testified you don't remember their names?
17     A.   Store 840?  I don't remember
18  their names.
19     Q.   And was that inventory issues
20  that those people told you about or also
21  morale problems?
22     A.   Inventory and morale.
23     Q.   You also stated that two other
24  black store managers have been demoted at

Page 231

1  816 and 801.  What knowledge do you have
2  that black store managers were demoted at
3  816 or 801?
4      A.   I was told personally by them
5  they were demoted.
6      Q.   Who are those people?
7      A.   Rick Henry for store 816 and
8  store 801 was Matt Welch.
9      Q.   And what did Matt Welch tell
10  you?
11     A.   He told me he was demoted.
12     Q.   Did he tell you if it was
13  voluntary?
14     A.   No.  He just told me he was
15  demoted.
16     Q.   So you don't know whether or
17  not it was voluntary?
18     A.   No.
19         MR. ABER:  Objection.
20  BY MS. BILENKER:
21     Q.   What did Rick Henry tell you?
22     A.   He was demoted.
23     Q.   Did he tell you he was
24  promoted after being demoted?

Page 232

1      A.   No.  He told me he was
2  demoted.
3      Q.   Do you have knowledge as to
4  whether he is still demoted or whether he
5  has been repromoted?
6      A.   No.
7      Q.   Do you know a Wawa employee
8  named Rob?
9      A.   Last name please?
10     Q.   You don't know his last name?
11     A.   I know a lot of Robs.
12     Q.   Who worked for Wawa?  An
13  assistant manager?
14     A.   There was Robert Bowden that I
15  worked with at 840.
16     Q.   He was at 840?
17     A.   Yes.
18     Q.   You made a comment to John
19  Poplawski about a lack of diversity.  Did
20  you ever complain about a lack of diversity
21  to anyone else at Wawa?
22     A.   I don't recall.
23         - - -
24     (Whereupon, Exhibit McCants-16

Page 233

1  was marked for identification.)
2         - - -
3  BY MS. BILENKER:
4      Q.   Mr. McCants, I've marked as
5  No. 16 the Initial Disclosures that you
6  filed in this case or that your lawyer
7  filed on your behalf.  The first question,
8  you were supposed to identify everyone you
9  believe —
10         MR. ABER:  Objection.
11  BY MS. BILENKER:
12     Q.   — has discoverable
13  information that you may use to support
14  your claims.  You've listed 29 people.
15  I've never seen a list like this before and
16  I'd like you to tell me who these people
17  are and what information they have to
18  support your claim of discrimination.  What
19  evidence does your wife have of
20  discrimination claims?  What knowledge does
21  she have?
22     A.   She was at that meeting I had
23  with Mr. Gallagher and Mr. Stief.
24     Q.   Anything else?

Love Court Reporting, Inc.                    **A-28**

ERRATA SHEET

PAGE       LINE        CORRECTION

43         2, 7, 10    Sheldton should be Shelton

44         19

52         14, 17, 23, 20

53         1, 8, 15

54         4, 12

55         2, 15, 20

56         23

83         19, 20

86         12, 19

103        2

56         21          Should be A. 840? I believe it
                       was Tim Grant, George Shelton, and
                       George DeNuzio.

56         22          Q. Do you know anything about
                       their qualifications or work history
                       with WAWA?