# EXHIBIT 4

Case 1:04-cv-00257-KAJ   Document 44-5   Filed 03/31/2005   Page 1 of 10



**WILCOX & FETZER LTD.**

In the Matter Of:

# McCants
# v.
# Wawa, Inc.

C.A. # 04-257 (KAJ)

Transcript of:

# Joseph F. Gallagher

November 23, 2004

Wilcox & Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: lhertzog@wilfet.com
Internet: www.wilfet.com

| McCants v. Wawa, Inc. | | |
|---|---|---|
| Joseph F. Gallagher | C.A. # 04-257 (KAJ) | November 23, 2004 |

Page 2

1  JOSEPH F. GALLAGHER,
2  the witness herein, having first been
3  duly sworn on oath, was examined and
4  testified as follows:
5  BY MR. ABER:
6  Q. Mr. Gallagher, you sat through Jeffrey McCants's
7  deposition, did you not?
8  A. That's correct.
9  Q. You understand how it works?
10 A. Yes.
11 Q. I'll be asking you a series of questions. You
12 will answer them to the best of your ability. If you
13 don't understand my question, ask me to explain it,
14 because if you don't, six months from now when we read
15 this transcript, we're all going to presume that you
16 understood it.
17 A. Okay.
18 Q. I have a habit sometimes of jumping in with a
19 second question before you may have finished your answer.
20 If I do that, stop me. In the same regard, let me finish
21 my question before you jump in with an answer.
22 A. Okay.
23 Q. You understand your answers must be verbal?
24 A. That's correct.

Page 3

1  Q. She doesn't do good with uh-uhs and uh-huhs.
2  A. Well aware of that.
3  Q. Have you ever given a deposition before?
4  A. No.
5  Q. Where do you live?
6  A. I live in Drexel Hill, Pennsylvania.
7  Q. Your address?
8  A. 4101 Rosemont Avenue.
9  Q. You're employed by Wawa?
10 A. That's correct.
11 Q. How long have you been employed by them?
12 A. Thirty-two years.
13 Q. Can you trace for me your work experience?
14 A. Sure. Started with them in 1972 as a store
15 assistant manager. Elevated to store manager a year
16 after that in 1973. From then on I was the store manager
17 20 years, 25 years. Went into the operations management
18 of it. Became a supervisor back then in 1987. After
19 that I went into the HR department, and I was the
20 regional training manager for three or four years, I
21 believe, and in the last four years now I have been back
22 in store operations as supervisor.
23 Q. When you said operations department, what is
24 operations?

Page 4

1  A. That's the stores. Operations is the field.
2  Q. So everybody who's a store manager is a part of
3  the operations department?
4  A. That's correct.
5  Q. As I understand it, there are different level
6  stores at Wawa classified as A, B, and C or such?
7  A. Yes, there is.
8  Q. Explain that classification to me.
9  A. The lower-volume stores start out with -- I
10 don't think there's any A's anymore. It's like B, C, D,
11 E, F, G. The higher the volume of the store, their
12 letter goes up. It's based on the CGM number which is
13 the profit of the store.
14 Q. What does CGM stand for?
15 A. Controllable gross margin. It's based on how
16 they adhere to all the responsibilities financially and
17 how the store progresses in that. And that at the end of
18 the year your level of CGM determines what category that
19 you're in.
20 Q. The M store is a bigger volume than a B store?
21 A. I'm sorry. What was that?
22 Q. An M store is bigger?
23 A. I don't think we have any Ms. We only go to H.
24 But, yes, the higher the alphabetical order --

Page 5

1  Q. The further down the alphabet you go, the bigger
2  the volume?
3  A. That's correct.
4  Q. What would be a gas store? What level would
5  that be?
6  A. All depends on the volume. All depends on the
7  volume.
8  Q. You could have a gas store that sells less than
9  what I'll call the nongas stores.
10 A. Yes, you could.
11 Q. How are managers compensated?
12 A. They're compensated on a weekly pay, plus their
13 bonus at the end of the month.
14 Q. Is the weekly pay the same for all managers?
15 A. No. It's based on the store that you're in.
16 Q. So a B-level store manager gets a lower base
17 salary than a D-level store manager?
18 A. That's correct.
19 Q. What's the difference in increments?
20 A. I believe it starts out at 600 and goes to 975.
21 Q. Per week?
22 A. Yes. Don't hold me to those exact numbers, but
23 it's in that range.
24 Q. A B-level guy is getting about 600. Then you

2 (Pages 2 to 5)

Page 10

1  discussed that there was any alternative other than
2  moving him to a lower store?
3      A.  Yes. Well, at that time --
4          MS. BILENKER: Object. I'm objecting
5  because you characterize it as a lower store.
6          MR. ABER: Go ahead.
7          THE WITNESS: Repeat the question, please.
8          MR. ABER: Can you read it back?
9          (The reporter read back as instructed.)
10         THE WITNESS: Yes.
11 BY MR. ABER:
12     Q.  What were those discussions?
13     A.  The discussions were that it was offered to Jeff
14 that we would seek other corporate opportunities if
15 available or move into an assistant manager in another
16 store to enhance his knowledge of being a manager. There
17 was several options presented to him at that time.
18     Q.  I want to do something unusual. I have here
19 documents Bates stamped W 0001 through 207 which are the
20 documents produced by Wawa concerning Mr. McCants in
21 response to my request and concerning his termination.
22 I'm going to ask you to look through those documents and
23 show me where that alternative was discussed. They're in
24 numerical order from 1 to 205.

Page 11

1          Have you reviewed those documents prior to
2  today?
3      A.  I have seen most of these documents, yes.
4      Q.  My question was --
5      A.  I am not sure -- of all these documents that are
6  here, I can't say I reviewed every one of them.
7      Q.  Did you review any documents in preparation for
8  today's deposition?
9      A.  I have reviewed some of the ones I had presented
10 to them, yes.
11     Q.  Which ones did you review?
12     A.  What am I looking for again?
13     Q.  I'm looking for a document that records the fact
14 that Mr. McCants was going to be offered an alternative
15 position other than being placed as an assistant manager.
16     A.  I'm not so sure that's written down in the
17 document, but I can... In some of the minutes it was
18 discussed there as Jeff could pursue other corporate
19 opportunities.
20     Q.  This document you're referring to is a document
21 Bates stamped W 00200. That is in your handwriting?
22     A.  That's correct.
23     Q.  There was no question in your mind that he was
24 going to be removed as manager of the store that he was

Page 12

1  working in prior to May 22nd, correct?
2      A.  Would you say that again, please?
3      Q.  Was there going to be any opportunity for Jeff
4  to stay as manager of the same store he was in managing
5  on May 21st, 2002?
6      A.  Most likely not for Jeff's best interest.
7      Q.  He was going to take a pay cut to some extent?
8      A.  To some extent, absolutely.
9      Q.  He viewed it as a demotion, didn't he?
10     A.  I can't speak for Jeff.
11         MS. BILENKER: Objection.
12     Q.  Did he express concerns that it would be viewed
13 as a demotion?
14     A.  Jeff expressed concerns of how other people
15 would take it, yes.
16     Q.  So the only alternative you gave him was to
17 resign, didn't you?
18     A.  I gave him that alternative, yes.
19     Q.  If he chose not to resign, what would you have
20 done?
21     A.  I can't speak for that because we didn't get to
22 that point.
23     Q.  Do you remember signing answers to
24 interrogatories? Let me show you a document. Is that

Page 13

1  your verification signature?
2      A.  Yes.
3      Q.  Take a look here at that document. Do you
4  recognize that document?
5      A.  No, I do not.
6      Q.  I was sent the document with your signature on
7  it as verification that those answers to those
8  questions -- we call them interrogatories -- are true and
9  accurate.
10         MS. BILENKER: Are you asking about a
11 particular interrogatory?
12         MR. ABER: I'm asking if he recognized
13 these interrogatories. You sent me his verification as
14 being true and accurate.
15 BY MR. ABER:
16     Q.  Did you sign that verification without knowing
17 what you were saying was true?
18         MS. BILENKER: These are the
19 interrogatories we answered.
20     A.  Okay. I have seen so many papers that I'm not
21 sure when you use the legal term of what actually it
22 means.
23     Q.  I call them questions.
24     A.  Questions is good for me.

Page 26

1  BY MR. ABER:
2      Q.  Was that writing put on there contemporaneously
3  with sending the e-mail or was it put on sometime after
4  you sent the e-mail?
5      A.  State that again, please.
6      Q.  When was the handwriting added to what had been
7  marked Gallagher 5, the e-mail dated April 15, 2002?
8      A.  I don't recall when I put that on there.
9      Q.  Would it have been written before or after
10 Mr. McCants was removed as manager of store 811?
11     A.  I don't recall when I put that on there.
12     Q.  You have no recollection at all?
13     A.  I don't recall when I wrote that on there, no.
14     Q.  You can't even recall whether it was before or
15 after?
16     A.  I don't recall when I wrote that on there.
17     Q.  Do you have any recollection of sending
18 Mr. McCants any e-mails other than what has been marked
19 Gallagher 3 and 5 specifically directed to him as a
20 result of your periodic visits?
21     A.  I don't recall any other ones, no.
22     Q.  So over the six months the two e-mails marked
23 Gallagher 3 and 5 are the only written criticisms that
24 you had of those periodic visits, right?

Page 27

1      A.  I'm sorry?
2          MS. BILENKER:  Objection.
3          MR. ABER:  If you have an objection as to
4  form -- you haven't said anything else.
5      Q.  Am I incorrect or correct?
6      A.  I didn't hear the question.
7      Q.  You testified that you made these periodic
8  visits two or three times a week to Mr. McCants's store
9  as part of your job.
10     A.  That's correct.
11     Q.  You also testified that you sent him numerous
12 e-mails.
13         MS. BILENKER:  Objection.  That is not the
14 correct characterization of his testimony.
15 BY MR. ABER:
16     Q.  Are you capable of correcting the misstatement
17 that I made, Mr. Gallagher?
18     A.  Uh-huh.  Yes.
19         MR. ABER:  Ms. Bilenker, if you have
20 objections to form, please feel free to make it, but
21 anything other than that will be inappropriate.
22     Q.  Did you write other e-mails, other than what has
23 been marked 3 and 5, to Mr. McCants?
24     A.  I don't recall any other ones, but possibly.

Page 28

1      Q.  Are there any other written documents that
2  record these periodic visits that you made three or four
3  times a week to Mr. McCants's store other than these
4  e-mails marked Gallagher 3 and 5?
5      A.  I'd like to correct you.  I never said I was
6  there three or four times a week.
7      Q.  How many times?
8      A.  Could be one or two times a week.
9      Q.  Let's just leave it at periodic.
10     A.  That's fine.  But don't say three or four if I
11 didn't say that.  That's all I'm saying.  I didn't say
12 three or four.
13     Q.  You made periodic visits to Mr. McCants's store.
14     A.  That's correct.
15     Q.  Several times a week?
16     A.  Periodic we said we would leave it at.
17     Q.  We have these two e-mails marked Gallagher 3 and
18 5, correct?
19     A.  Correct.
20     Q.  Do you have any other written documentation
21 recording those visits to those stores other than
22 Gallagher 3 and 5?
23     A.  Referring to personal visits in the store?
24     Q.  Yes.

Page 29

1      A.  Probably not.
2      Q.  Is there a job description for your position?
3      A.  Excuse me?
4      Q.  Is there a written job description for your
5  position?
6      A.  Yes, there is.
7      Q.  What's it called?
8      A.  Area supervisor.  Job description for area
9  supervisor.
10     Q.  Do you have any manuals that describe how you
11 perform your job or how you should perform it?
12     A.  The job description will tell you that.
13     Q.  Is that a one-page document?
14     A.  Uh-huh.  Yes.
15     Q.  Any training manuals that you looked at?
16     A.  Any training manuals that we have?  No, I don't
17 believe so.  I can't answer that.  I'm not sure.
18     Q.  Had you ever gone through any training as to how
19 to be an area supervisor?
20     A.  Yes.  We have had numerous classes that we have
21 been to.  We have attended seminars and things like that
22 for training.
23     Q.  Did you receive written materials at those
24 seminars?

Page 34

1  hours to work for the week. He can vary that.
2  Q. So he could work from, say, 6 o'clock in the
3  morning till noon and then come back from 4 o'clock to
4  7 o'clock to get his eight hours. That's eight hours a
5  day?
6  A. It's not common practice, but he could do that.
7  Q. Did you ever determine why he wasn't on the
8  premises?
9  A. Several times I have asked employees and they
10 said he was here and left.
11 Q. Did you ever ask him where he was?
12 A. Yes. He said I had worked for the day and I was
13 gone.
14 Q. Did you have reason to believe that he was not
15 telling you the truth?
16 A. After several visits that started making me to
17 look into his actual time that he did work, and that, in
18 hindsight, produced that document where he did not
19 fulfill his 46.75 hours per week.
20 Q. This was uniform for a period of time that this
21 was going on?
22 A. Yes. This was several weeks, right.
23 Q. The document we just identified records it
24 for --

Page 35

1  A. Two months.
2  Q. Do you remember what Mr. McCants said during his
3  deposition about that document, McCants 10?
4  A. I don't remember everything he stated in his
5  deposition, no.
6  Q. Did he give you any explanation when you gave
7  him this document as to why his hours were a little
8  short?
9  A. He stated to me he didn't think he was doing
10 anything wrong by not fulfilling the 46.75 hours.
11 Q. Did he tell you why he wasn't fulfilling the 46
12 and a half hours?
13 A. He stated that he thought he was okay working
14 the amount of hours that he did.
15 Q. Did he say why he thought it was okay?
16 A. Not at that time, no.
17 Q. Did he give a reason to you as to why he was
18 working less than 46 and a half hours?
19 A. No.
20 Q. After you gave him this memo which was, I guess,
21 at the end of February, because that's the last week you
22 record --
23 A. Right.
24 Q. -- did you continue to see the same level of

Page 36

1  attendance?
2  A. No. He got better. He worked his 46.75.
3  Q. So the commitment, as far as evidence of
4  commitment by attendance, that improved after you gave
5  him that memo?
6  A. It improved, yes.
7  Q. What other evidence was there of lack of
8  commitment?
9  A. His commitment to the store associates in as far
10 as them helping him out to run the store. Jeff was
11 several times never out on the sales floor to support his
12 team, which was a major role in manager, is to support
13 the store and make it run efficiently. Several comments
14 that I have received from the store associates aligning
15 that commitment.
16 Q. What store associates did you discuss this with?
17 A. Several. Sharon Ryan, Sharon Young,
18 Robin Blanton, Samantha Ryan, Janice Freelander. Several
19 of the associates that worked with Jeff.
20 Q. Let's go through the list. Who are they again?
21 A. Sharon Young.
22 Q. Who else?
23 A. Sharon Ryan.
24 Q. Who else?

Page 37

1  A. Robin Blanton.
2  Q. Anybody else?
3  A. Samantha Ryan.
4  Q. Anybody else?
5  A. Janice Freelander.
6  Q. Freelander?
7  A. Freelander.
8  Q. Anybody else?
9  A. Chrissy Monhollan.
10 Q. She was his assistant manager, correct?
11 A. Right.
12 Q. She thought he was not doing a good job?
13 A. She questioned his commitment.
14 Q. How did she question his commitment?
15 A. By not being there all the time supporting the
16 staff.
17 Q. Anybody else?
18 A. They are the main ones. There was probably
19 other ones in passing during my visits.
20 Q. We will discuss them later. There are some
21 documents that had been produced to me, written
22 statements by some of these people. Were these documents
23 given to you while Mr. McCants was working at the store?
24 A. Actually, no, they were not. They were given to

Page 38

1  me afterwards.
2  Q. After he had left the store?
3  A. Actually, yes. I believe that was right,
4  because he never came back.
5  Q. But when they were written, had he already been
6  removed as manager?
7  A. No. He never returned.
8  Q. Were they written after his last day in the
9  store?
10 A. Yes.
11 Q. Were they written after the employees were told
12 he was not coming back?
13 A. No.
14 Q. They were written while they still thought he
15 was coming back as a manager?
16 A. Yes. They were verbal discussions that I had
17 with the associates and I asked them to put it down in
18 writing.
19 Q. When did you ask them to put it down in writing?
20 A. I don't recall.
21 Q. Was it before or after the meeting with
22 Michael Stief?
23 A. Before.
24 Q. When was the meeting with Michael Stief?

Page 39

1  A. May 31st I'm going to say.
2  Q. Any other observations you made that evidence
3  lack of commitment?
4  A. Not as far as commitment. Then there was morale
5  issues.
6  Q. Morale issues are the same things as the
7  comments made by these same people about lack of
8  commitment?
9  A. Yes.
10 Q. Anything else? Any other observations that you
11 made?
12 A. No.
13 Q. The second thing that you stated that led you to
14 recommend the removal of Mr. McCants was the
15 conversations with employees. Are these the same
16 conversations that you referred to about lack of
17 commitment and morale?
18 A. The same types of conversations, that's correct.
19 Q. Any other conversations that you had?
20 A. On several occasions. No, that's all.
21 Q. You also mentioned you had conversations with
22 Jeff that led you to make the recommendation to remove
23 him.
24 A. That's right. I gave Jeff feedback on

Page 40

1  everything that happened in the store.
2  Q. What happened in the conversations you had with
3  Jeff that made you feel he should be removed as manager?
4  A. Because I did not see the commitment from Jeff
5  to follow up on any of the issues that were needed to be
6  addressed in the store.
7  Q. That's his performance. I'm saying is there
8  anything he said to you that led you to make that
9  recommendation.
10 A. No. It was his actions.
11 Q. The reason I'm trying to narrow it down, you
12 said your conversations with Jeff. So it's nothing that
13 he said that led you to recommend his removal?
14 A. It was the conversations we had regarding his
15 actions in the store.
16 Q. Conversations with him?
17 A. That's correct.
18 Q. What did he say in those conversations that made
19 you recommend his removal?
20 A. It was about his execution in the store or lack
21 of it.
22 Q. Did he say something that said I don't care what
23 you say, I'm not going to do it?
24 A. I don't specifically remember anything.

Page 41

1  Q. The fourth thing you said you looked at was
2  statistical information. What statistical information
3  did you consider?
4  A. Well, the financial results of the store. There
5  were shrink issues, but they were not the leading cause
6  for his not being successful in the store. It was the
7  team-building, morale, and commitment.
8  Q. What kinds of things did you consider the
9  statistical information?
10 A. Shrink results, because that shrink result is a
11 result of team-building and commitment and morale to the
12 store.
13 Q. As I understand it, shrink result is the amount
14 of merchandise that walks off the premises without being
15 paid for?
16 A. Shrink is unaccountable loss.
17    MR. ABER: Off the record.
18    (Discussion off the record.)
19 BY MR. ABER:
20 Q. Did you consider the CGM of the store?
21 A. What do you mean by that question?
22 Q. I asked you what factors you considered in
23 recommending the removal of Mr. McCants. You went
24 through observation, conversations with employees,

Page 58

1  Q. I'm not questioning whether it's proper or
2  improper. I'm just trying to understand.
3  A. That's correct.
4  Q. In this memo now in Gallagher 9, I don't see the
5  word "shrink" anywhere. Is she discussing shrinkage or
6  shrink?
7  A. That's what this memo is about, shrink, yes.
8  Q. During any of these visits that you were having
9  with Mr. McCants, did he ever complain to you that he
10 thought that Wawa was not adequately addressing issues of
11 diversity?
12 A. He never addressed it to me, no. One time, and
13 when I first took over, he had just mentioned it in
14 passing, but that was it.
15 Q. When was that? When did you take over?
16 A. Started in December.
17 Q. Were there any discussions after that?
18 A. No further discussions, no.
19 Q. Let me hand you a document which I will tell you
20 that I have temporarily removed some notes from it. I
21 want to ask you if you recognize that document. I'll ask
22 that it be marked.
23 A. Uh-huh.
24 Q. I have blocked out some notes first, but I want

Page 59

1  to see if you can identify it.
2      Mark that as No. 10.
3      (Gallagher Deposition Exhibit No. 10 was
4  marked for identification.)
5  BY MR. ABER:
6  Q. Do you recognize that document?
7  A. Yes. It's a document that I produce when I sit
8  down and coach managers.
9  Q. Explain to me what this document that's been
10 marked Gallagher 10 is.
11 A. It's a document that I use to -- gives me a
12 guideline to what I want to discuss with the managers
13 when I sit down and coach them.
14 Q. You fill one out for each. Do you have a stack
15 of these for each store someplace?
16 A. No. It's something that I came up with.
17 Q. Because I only see one of these in the documents
18 that were produced.
19 A. It's not something that I always gave to
20 everyone. It was kind of like my driving force to talk
21 about things.
22 Q. Once in a while you made it and some you didn't.
23 The one I have given you marked 10 is not the one that
24 was produced to me. I changed it.

Page 60

1  A. That's okay.
2      MR. ABER: Let's mark this one as 11.
3      (Gallagher Deposition Exhibit No. 11 was
4  marked for identification.)
5  BY MR. ABER:
6  Q. The only time you discussed diversity with
7  Mr. McCants is when you took over?
8  A. Pretty much. In passing. Passing note.
9  Q. This document was dated March 18th, 2002.
10 A. Uh-huh.
11 Q. Is that your handwriting that is now on the side
12 there?
13 A. Yes, it is.
14 Q. You there mention you talked to him about
15 team-building. What's underneath?
16 A. "Morale."
17 Q. There's a mention about "Jeff gas store."
18 A. Those three comments there were Jeff's
19 opportunity in the company. He wanted to branch out to
20 different things.
21 Q. That's what he said.
22 A. Yes.
23 Q. What's the reference to diversity about?
24 A. Branching out into different aspects of the

Page 61

1  company.
2  Q. That's not a diversity as in racial diversity?
3  A. No, it was not.
4  Q. He didn't complain to you, then, that he thought
5  he should have gotten a gas store and it was a lack of
6  diversity?
7  A. No, because I have no dealing with that. I
8  can't speak to anything prior to me taking over.
9      MR. ABER: Mark that.
10     (Gallagher Deposition Exhibit No. 12 was
11 marked for identification.)
12 BY MR. ABER:
13 Q. I have given you a document that's been marked
14 Gallagher 12. This is an e-mail from Robin Blanton to
15 you on May 19th, which was, by my count, three days
16 before you recommended the demotion of Mr. McCants.
17     Did you ever show him this e-mail?
18 A. I don't think so. I don't recall.
19 Q. In the bottom she says, "Yes I know I should be
20 discussing this with my manager but I chose to come to
21 you."
22     What did she mean by that?
23     MS. BILENKER: Objection.
24     MR. ABER: Did I misread it?

16 (Pages 58 to 61)

Page 62

1   MS. BILENKER: I'm objecting to that
2 question.
3   A. I can't speak for what she's saying. I can only
4 interpret the information that she has above.
5   Q. You know what I mean by the chain of command?
6   A. Uh-huh.
7   Q. Is there some expectation that she should have
8 gone first to her manager with her complaints rather than
9 bypassing him?
10   A. There's always an expectation that you follow
11 the chain of command.
12   Q. Did you ask her why she did not go through her
13 chain of command?
14   A. On this particular document?
15   Q. Yes.
16   A. I don't remember even speaking to her about this
17 document, to tell you the truth.
18   Q. Who was the manager of the store before
19 Mr. McCants?
20   A. I believe it was Tom Grant.
21   Q. Store 811 was what level store?
22   A. It was an E.
23   Q. E? When Tom Grant left store 811, where did he
24 go?

Page 63

1   A. I don't know. I wasn't in charge of him.
2   Q. Is he still working in the company?
3   A. I don't believe he is now.
4     (Gallagher Deposition Exhibit No. 13 was
5 marked for identification.)
6 BY MR. ABER:
7   Q. Do you recognize these documents?
8   A. Yes. They're payroll documents.
9   Q. Do you know why they would have been in
10 Mr. McCants's personnel file?
11     MS. BILENKER: Objection.
12   A. I can't speak for that.
13   Q. There was a note in the file discussing his
14 attendance I saw someplace about although his attendance
15 improved, you thought someone went back and looked at the
16 records and thought he had altered the records, time
17 records.
18   A. I can't speak for what you're saying if someone
19 else did it. I don't know.
20   Q. Did you ever see any evidence of that?
21   A. Yes.
22   Q. Are these documents evidence of that?
23   A. Yes. These documents show that someone edited
24 the time card.

Page 64

1   Q. How do they show that there was an edit of the
2 time card?
3   A. The number 2 on the document states that the
4 card was punched in manually after the time. If you look
5 at the descriptions up at the top there.
6   Q. When I used to work in a factory, there was a
7 time clock. You walked in, you took a card, and you went
8 clock, clock. You took it from one slot and put it in
9 another slot. Is that the type of time clock we're
10 talking here?
11   A. No. This is computer-based. You walk in and
12 clock into the computer.
13   Q. You go to your keyboard and type it in?
14   A. Type in your Social Security number.
15   Q. Does each employer have his own computer?
16   A. No.
17   Q. How many computers are there in the store?
18   A. One.
19   Q. What are the computers used for?
20   A. Reports, document. All types of things are on
21 there.
22   Q. Do they use them for balancing the cash
23 register?
24   A. Yes. They do that, too.

Page 65

1   Q. How does everybody use the computer at the same
2 time?
3     MS. BILENKER: Objection.
4   A. Everyone doesn't use it at the same time.
5   Q. Say if the manager is doing his financial
6 reports and someone comes in to work while he's doing his
7 financial reports. Does he have to stop doing his
8 financial reports to clock the person in?
9   A. There's a speed key that you can hit on there
10 just to clock in. It doesn't kick the other person out
11 of anything.
12   Q. Is there more than one terminal for the
13 computer?
14   A. Now there is an alternate clock. At this
15 particular time there was not.
16   Q. When you say "at this time," did it have the
17 speed key then?
18   A. Yes.
19   Q. Where was the speed key on the keyboard? In
20 other words, if somebody was balancing the till, or maybe
21 I'm not using the right term, someone else could walk
22 over and how would you type in your --
23   A. There's a speed key that hits you back to the
24 time card sheet where it says just clock in. That allows

17 (Pages 62 to 65)

Page 66

1 people to go clock in. It doesn't affect anything else
2 that's going on.
3   Q. Does the person that's using the keyboard have
4 to stop doing what they're doing?
5   A. Obviously, yes.
6   Q. If I'm balancing the till or ordering something,
7 I have to stop doing that to allow the next person to
8 clock in?
9   A. Yes. For three, four seconds it takes.
10   Q. If that person doesn't clock in immediately and
11 does it later, would that show up at 2?
12   A. That's correct.
13   Q. I don't fully understand what these documents
14 are. On page 176, are these two different time cards or
15 are they -- there's on in the middle of the page and one
16 at the bottom.
17   A. There's two different incidents. One is for
18 4/10 I believe on the left-hand side, the top one. The
19 other one down at the bottom is for 4/8.
20   Q. Turn to the third page, which is May 10th. Does
21 that show anything irregular?
22   A. May 10th. May 10th does not show.
23   Q. Or May 11th.
24       MS. BILENKER: You mean April?

Page 67

1       MR. ABER: I'm looking at May. I'm on
2 page 178.
3   A. Okay.
4   Q. Is that not for May 10th and May 11th in the
5 middle of the page?
6   A. Yes, that's correct.
7   Q. Anything peculiar that day?
8   A. No.
9   Q. I'm just curious why it's here. That's what has
10 got me confused.
11       If you go to the next page, page 179, there
12 are some numbers again for May 10th with 2s on them.
13   A. That's a different person, the one you just
14 stated at the top there.
15   Q. How do you identify the employee?
16   A. By name.
17   Q. I see.
18   A. See the Social Security.
19   Q. Now I got you.
20       MS. BILENKER: So we're clear, that 178 is
21 5/10, 5/11, that's C. Huyard, not Jeff McCants.
22 Jeff McCants continues at the bottom of 178.
23 BY MR. ABER:
24   Q. Is there any reason why somebody would manually

Page 68

1 punch in and out other than the desire to cheat on their
2 time card that you can think of?
3   A. I can't speak for why people do that.
4   Q. Is there any logical reason for why that might
5 happen?
6   A. They're told when they come to work for Wawa the
7 first thing you do is clock in.
8       (Gallagher Deposition Exhibit No. 14 was
9 marked for identification.)
10 BY MR. ABER:
11   Q. Do you recognize what's been marked as
12 Gallagher 14?
13   A. Yes.
14   Q. It's a statement made by Sharon Ryan for you?
15   A. That's correct.
16   Q. Do you know when that was written?
17   A. The exact date I'm not sure.
18   Q. Was it written before or after Mr. McCants's
19 last day as manager of store 811?
20   A. I'm not sure.
21   Q. After a decision was made to recommend his
22 demotion, did you solicit any statements?
23   A. No. These statements were given to me on their
24 own. I solicited that they put it in writing.

Page 69

1   Q. I'm sorry?
2   A. These statements were given to me verbally. I
3 solicited that they put it in writing anything that they
4 feel.
5   Q. Were they given to you verbally before or after
6 Mr. McCants's last day on the job?
7       MS. BILENKER: We went over this already.
8       MR. ABER: No.
9   A. Verbally they were given to me before.
10   Q. So I understand, comments were made to you
11 verbally. You made the recommendation that Mr. McCants
12 be demoted. And then you approached these employees and
13 asked them to put their statements in writing?
14   A. That's not correct. When they verbally told it
15 to me, I said please put that in writing.
16       (Gallagher Deposition Exhibit No. 15 was
17 marked for identification.)
18 BY MR. ABER:
19   Q. Did you recognize what has been marked 15?
20   A. Yes.
21   Q. Is that another one that was given to you
22 verbally before but then you asked them to put it in
23 writing?
24   A. Right. These comments were made to me on my