# EXHIBIT 13

## Westlaw.

Not Reported in F.Supp.2d
2000 WL 1868179 (D.Del.)
**(Cite as: 2000 WL 1868179 (D.Del.))**

**H**
Only the Westlaw citation is currently available.

United States District Court, D. Delaware.
Steven C. STAFFORD, Plaintiff,
v.
NORAMCO OF DELAWARE, INC., Defendant.
**No. CIV. 97-376 GMS.**

Dec. 15, 2000.

MEMORANDUM AND ORDER
I. INTRODUCTION

*1 The plaintiff, Steven C. Stafford ("Stafford"), acting pro se, filed a complaint against the defendant, Noramco of Delaware ("Noramco") on May 9, 1997 (D.I.2). In his complaint, Stafford, who is African American and was at the time 46 years of age, alleges that Noramco based its decision not to hire him on his race and age in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq ("Title VII") and the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621 et seq. ("ADEA"). [FN1] After initially denying Stafford's motions to compel discovery, the court ordered Noramco to produce limited discovery to assist Stafford in responding to Noramco's then pending motion for summary judgment (D.I.62). [FN2] Noramco filed a "Renewed Motion for Summary Judgment" on March 15, 2000 (D.I.67). Since Stafford has failed to establish a prima facie case of race or age discrimination, and because he has not offered any evidence to demonstrate the existence of a genuine issue of material fact, the court will grant Noramco's motion and enter judgment accordingly.

FN1. Stafford also claimed violations of the Americans with Disabilities Act (ADA). However, the court granted Noramco's motion to dismiss the ADA claim on March 26, 1998 (D.I.14).

FN2. In its order partially granting

Stafford's motions to compel, the court dismissed Noramco's motion for summary judgment without prejudice and gave the parties until March 15, 2000 to file dispositive motions in light of the court ordered discovery.

II. STANDARD OF REVIEW

A court must grant summary judgment when there are no genuine issues of material fact and the party is entitled to judgment as a matter of law. See Fed.R.Civ.P. 56(e); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Once a party moves for summary judgment and claims the absence of evidentiary support for the case, the burden is on the nonmovant to proffer at least a scintilla of evidence to raise a genuine issue of material fact. See Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., 998 F.2d 947, 951 (3d Cir.1993) (internal quotations omitted).

In Title VII and ADEA cases, a defendant is entitled to summary judgment if it can demonstrate that the plaintiff cannot carry its burden of proof under the burden shifting framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). [FN3] The defendant must prevail on summary judgment if: (1) it can show that the plaintiff is unable to establish a prima facie case of discrimination [FN4] or (2) the plaintiff has established a prima facie case but defendant can show that the plaintiff cannot produce sufficient evidence to rebut an assertion of a non-pretextual reason for the discharge or refusal to hire. See Janil v. Avdel Corp., 873 F.2d 701, 706-07 (3d Cir.1989).

FN3. The analysis in which the court must engage is identical for Title VII and ADEA cases. See, e.g., Stanziale v. Jargowski, 200 F.3d 101, 108 (3d Cir.2000) (stating that "[t]he parties' burdens in establishing and defending claims under the ADEA and Title VII are determined by the procedure set forth in McDonnell Douglas ....). A plaintiff has

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2000 WL 1868179 (D.Del.)
(Cite as: 2000 WL 1868179 (D.Del.))

Page 2

the initial burden of proving by a preponderance of the evidence a prima facie case of discrimination. The burden then shifts to the defendant to rebut the charge of discrimination by articulating a legitimate, non-discriminatory reason for its actions. Since the burden of persuasion ultimately rests with the plaintiff, the plaintiff must prove by a preponderance of the evidence that the reasons offered by the defendant are pretextual and that the defendant intentionally discriminated against the plaintiff. *See, e.g., McDonnell Douglas,* 411 U.S. at 802-03; *Jackson v. University of Pittsburgh,* 826 F.2d 230, 232 (3d Cir.1987).

FN4. The elements of a prima facie case of race and age discrimination in a failure to hire case are that (1) the plaintiff belongs to a protected class, (2) the plaintiff applied for and was qualified for the position, (3) the plaintiff was rejected and (4) someone similarly situated from outside the protected class was treated more favorably. *See, e.g., Texas Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 252-53 (1981). The only difference between a Title VII and an ADEA claim is what constitutes a protected class. Claimants under Title VII must show they are members of a protected racial or gender classification while a claimants under the ADEA must show they are over 40 years of age. *Compare id.* (Title VII case) with *Sempier v. Johnson & Higgins,* 45 F.3d 724, 728 (3d Cir.1995) (ADEA case).

Noramco contends that Stafford has failed to meet the first prong of the *McDonnell-Douglas* test--he has not established a prima facie case of age or race discrimination. Noramco argues (1) that Stafford has not demonstrated that he is qualified for the position and (2) that he cannot show he was replaced by a person sufficiently younger to raise an inference of age discrimination. Further, Noramco argues that even if Stafford were to overcome the first prong, he has not proffered any evidence to satisfy the third prong of the *McDonnell-Douglas* test--that Noramco's articulated legitimate,

nondiscriminatory reasons for its actions were pretextual. With the aforementioned standards in mind, the court turns to the facts of the case as they appear in the record before it. [FN5]

FN5. The record thus far in the case relevant to the instant motion is an affidavit from Claudia S. Cobble, Manager, Human Resources for Noramco (D.I.49), supplemental answers to interrogatories (D.I.37), initial discovery pursuant to Fed.R.Civ.P. 26(a) (D.I.20), and Noramco's responses to the court's request for information dated February 10, 2000 (D.I.65). The other affidavits, from Jennifer Gimler Brady, Esq. and from Stafford relate to discovery disputes that were resolved by the court in its January 11th order.

## III. FACTUAL BACKGROUND

**\*2** Noramco, a manufacturer of pharmaceutical products, advertised in the November 27, 1997 edition of the News Journal for a Laboratory Technician for its Wilmington facility. [FN6] Stafford submitted a cover letter and resume to Ms. Cobble. Stafford's resume states he worked in the field for approximately 16 years at both Air Products and Chemicals, Inc. in Linwood, Pennsylvania and at E.I. duPont Company in Wilmington, Delaware. He also graduated with a B.S. in biology and chemistry from North Carolina A & T State University.

FN6. Noramco is a division of Ortho-McNeil Pharmaceuticals, Inc., a wholly owned subsidiary of Johnson & Johnson.

Stafford was invited to Noramco in December, 1997, and was interviewed by Ms. Cobble, William Rogers, Acting Quality Assurance/Quality Control Manager, and Melodye Marks, West Plant Lead Chemist. After the interview was completed, the three interviewers conferred and decided not to further pursue Stafford's candidacy. They felt he did not meet the job requirements since they thought he could not (1) work without direct supervision, (2) keep accurate records, or (3) operate and maintain all laboratory equipment. [FN7] Ms. Cobble sent

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**A-79**

Not Reported in F.Supp.2d
2000 WL 1868179 (D.Del.)
(Cite as: 2000 WL 1868179 (D.Del.))

Page 3

Stafford a letter on December 20, 1994 stating "[a]fter assessing the qualifications represented by each of the candidates, we are pursuing individuals whose skills are more closely aligned with the demands of the position."

> FN7. Attached to Ms. Cobble's affidavit is a description of the position for which Stafford applied. The description states, in part, that the critical duties of the position are to "[w]ork[ ] normally without direct supervision ... [k]eep accurate, legible records of all work performed, [m]aintain[ ] laboratory inventory ... [o]perate[ ] all laboratory equipment apparatus ... [p]erform[ ] maintance on user-severicable elements of laboratory equipment and instrumentation ... [and m]aintain[ ] a clear and safe analytical chemistry laboratory ...."

Noramco eventually hired John Daniels for the position of Laboratory Technician. [FN8] Mr. Daniels was a 48 year old Caucasian male at the time he received the offer of employment. Prior to the offer of employment, Mr. Daniels worked as an analytical technician at the Scott Paper Company for at least 26 years. Finally, Mr. Daniels has an Associates Degree in Chemical Engineering from Temple University.

> FN8. Prior to extending an offer to Mr. Daniels, Noramco offered the position to two other individuals who both appear to have been over 40 years of age at the time and possessed significant laboratory experience.

IV. DISCUSSION

Rather than contest the facts presented by Noramco, Stafford's answering brief asserts that discovery is not complete since "NORAMCO is with-holding (sic) evidence." This argument is identical--in language as well as substance--to Stafford's answering brief filed in opposition to Noramco's first motion for summary judgment (D.I.55). Indeed, Stafford again cites Fed.R.Civ.P. 56(f) and demands that he be allowed to "complete" discovery. The court has given Stafford more than ample time to prosecute his case and to gather

discovery to respond to Noramco's present motion for summary judgment. [FN9] At this point in the litigation, the court is convinced that Stafford's failure to raise a genuine issue of material fact has more to do with the merits of his claims than with the pace and scope of the proceedings to date. [FN10] Therefore, the court will not grant Stafford's request for a second extension of time for discovery pursuant to Fed.R.Civ.P. 56(f).

> FN9. As mentioned above, the court dismissed an earlier summary judgment motion by Noramco, ordered Noramco to respond to several discovery requests, and extended the time for discovery past the original deadline.

> FN10. As Noramco correctly points out, Stafford has not pointed to any specific facts or issues that additional discovery would produce, why the information sought is relevant, and what additional steps he has taken to obtain the information. Ironically, the record indicates that the discovery Stafford sought prior to the court's January 11th order further strengthened Noramco's case rather than providing him with facts to oppose a second motion for summary judgment. Stafford's cries of foul play and pleadings for additional time, by themselves, are not enough to grant the opportunity for additional discovery. *See Metsopulos v. Runyon,* 918 F.Supp. 851, 864 (D.N.J.1996) (stating that nonmovant cannot defeat summary judgment by "attach[ing] to his brief a hodge-podge of statements, mostly unsworn" and requesting discovery after discovery had closed).

Turning to whether Stafford has met his prima facie burden on the issue of race discrimination, the court finds that he has not satisfied the initial *McDonnell-Douglas* requirements. Although Stafford has shown he is a member of a protected class and that he was denied the position in favor of someone who is not a member of a protected class, he has not demonstrated, by a preponderance of the evidence, that he was more qualified or that Mr. Daniels was treated more favorably. Stafford's brief

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**A-80**

Not Reported in F.Supp.2d
2000 WL 1868179 (D.Del.)
**(Cite as: 2000 WL 1868179 (D.Del.))**

Page 4

recites nothing more than his opinion regarding the qualifications of the two men based solely on Mr. Daniel's educational and publishing background. [FN11] Based on these differences and the fact that he was not offered employment, Stafford relies on the flawed syllogism that Noramco must have discriminated against him on the basis of race. Indeed, Stafford admitted as much to the court at a January 10, 2000 status conference.

> FN11. Stafford's brief relies heavily on the fact that he received a "4-year B.S. Degree" but that Mr. Daniels received a "2-year B.A. Degree" and that Mr. Daniel's resume does not indicate whether he has published any articles in scientific journals.

*3 What Stafford overlooks is that the qualifications for the position at issue extended beyond mere academic fitness. The position description specifically mentions the qualities which Noramco found lacking in Stafford. Ms. Cobble's uncontradicted affidavit recites Noramco's belief that Stafford could not work without supervision, keep accurate records, or adequately maintain laboratory equipment. [FN12] Since these qualifications were explicit and appear to have been just as important as educational background to Noramco's hiring decision, the differences Stafford raises are insufficient to create a prima facie case of race discrimination. [FN13]

> FN12. Stafford has not produced a scintilla of evidence to suggest that he was more qualified than Mr. Daniels in any area other than academic qualifications.

> FN13. In its brief, Noramco cites a determination by a Social Security Administrative Law Judge that Stafford is disabled because of a "severe personality disorder" and that he is "suspicious, hostile, and continually feels victimized." While this finding, in and of itself, does not suggest Stafford is unqualified for the position, it suggests why, despite overwhelming evidence, he continues to believe Noramco discriminated against him.

Even if Stafford were to overcome the aforementioned fatal deficiencies in his Title VII claim, the record demonstrates that he cannot meet his ultimate burden under *McDonnell Douglas.* Since Noramco has articulated non-discriminatory reasons for its actions--Stafford did not possess the necessary qualifications--the burden shifts back to Stafford to demonstrate that Noramco's justification of its actions is pretextual. To meet this burden, Stafford must submit evidence to demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in [Noramco's] proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Fuentes v. Perskie,* 32 F.3d 759, 764 (3d Cir.1995) (quoting *Josey v. John R. Hollingsworth Corp.,* 996 F.2d 632, 638 (3d Cir.1993) (internal quotations and citations omitted)). Stafford has not proffered any evidence--other than his own suspicions--which would lead the court to believe Noramco's reasons were pretextual. This utter lack of factual evidence further requires the court to enter summary judgment in favor of Noramco on the Title VII claim.

Stafford's claim of discrimination under the ADEA fails as well. Although Stafford was 46 at the time of the events, the record demonstrates that Mr. Daniels was 48 at the relevant time--two years *older* than Stafford. As a matter of law and fact, Stafford cannot show that Noramco discriminated against him under the AEDA since Mr. Daniels is not "sufficiently younger" than Stafford to permit an inference of discrimination. [FN14]

> FN14. In establishing a prima facie case of discrimination under the AEDA, a plaintiff must show that the person ultimately hired was "sufficiently younger". *See Sempier,* 45 F.3d at 728. The courts have found that the hired person must be at least eight years younger than the plaintiff. *See Narin v. Lower Merion Sch. Dist.,* 206 F.3d 323, 333 (3d Cir.2000) (finding that plaintiff failed to establish prima facie case under ADEA where plaintiff was six years older than person hired); *Barber v. CSX Distrib. Serv.,* 68 F.3d 694, 698 (agreeing with district court that plaintiff established prima facie case of age discrimination where plaintiff was eight years older than person hired).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**A-81**

Not Reported in F.Supp.2d
2000 WL 1868179 (D.Del.)
**(Cite as: 2000 WL 1868179 (D.Del.))**

Page 5

V. CONCLUSION

In recognition of Stafford's pro se status, the court has gone out of its way to ensure that he has had sufficient time for discovery, and has repeatedly given him the benefit of the doubt as to whether he could pursue his claims. However, it is time for this case to end. A review of the record demonstrates, beyond any peradventure of a doubt, that Stafford has failed raise any genuine issues of material fact and has not met either his initial or his ultimate burdens under the framework established for adjudicating claims under Title VII and the ADEA.

For the reasons mentioned above, it is HEREBY ORDERED THAT:

   1. Stafford's request for an Extension of Time is DENIED pursuant to Fed.R.Civ.P. 56(f). [FN15]

       FN15. Although Stafford did not make a formal motion under Fed.R.Civ.P. 56(f), the court construes his request as such.

  **\*4** 2. Noramco's Renewed Motion for Summary Judgment (D.I.67) is GRANTED.

   3. Summary Judgment be and is entered against STAFFORD on all claims.

2000 WL 1868179 (D.Del.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**A-82**

Westlaw.

Slip Copy                                                                         Page 1
2004 WL 2283597 (D.Del.)
**(Cite as: 2004 WL 2283597 (D.Del.))**

Only the Westlaw citation is currently available.

United States District Court,
D. Delaware.
Dale A. HAYES Plaintiff,
v.
DAISY CONSTRUCTION CORPORATION,
Defendant.
**No. Civ.A. 02-066 GMS.**

Sept. 28, 2004.
Dale A. Hayes, Wilmington, DE, pro se.

William W. Bowser, Adria Benner Martinelli,
Young, Conaway, Stargatt & Taylor, Wilmington,
DE, for Defendant.

*MEMORANDUM*

SLEET, J.

I. INTRODUCTION

**\*1** The plaintiff, Dale A. Hayes ("Hayes"), filed the
above-captioned suit, *pro se,* against his former
employer, Daisy Construction Corporation
("Daisy"), alleging that it violated Title VII of the
Civil Rights Act, 42 U.S.C. § 2000(e) *et seq.,* by
discriminating against him because of his race. He
also alleges, in two amended complaints, that Daisy
"fail[ed] to promote," "fail[ed] to pay the prevailing
wage as a concrete finisher," and "fail[ed] to honor
[the] contract," causing Hayes "mental anguish,
pain, and suffering." (D.I.12, 19). Hayes, an
African-American male, was employed as a cement
finisher in an apprenticeship program at Daisy.
Over the course of his employment, Hayes alleges
that Daisy discriminated against him based on his
race and color. Hayes contends that he was unable
to work in such an atmosphere and, therefore, was
"forced" to resign in September of 1998. Presently
before the court is Daisy's motion for summary
judgment based upon an asserted dearth of record
evidence to support Hayes's claims. For the
following reasons, the court will grant the motion.

II. BACKGROUND

On August 10, 1995, Daisy hired Hayes as a
laborer; at a base pay rate of $8.00 per hour for
non-contract work and $10.50 per hour for contract
work. In 1997, Hayes participated in an on-the-job
training apprenticeship program (the "OJT
Program"), in the trade of concrete finishing, for the
rehabilitation of the I-95 Toll Plaza (the "Toll Plaza
Project") in Newark, Delaware. The OJT Program
was conducted pursuant to the Federal Highway
Administration regulations program, which
promotes the training of minorities to skilled
journeymen status. 23 C.F.R. § 230.101, Subpart A,
app. b. By participating in this program, Daisy is
reimbursed 80 cents per hour of training provided
to an employee. *Id.* As part of the OJT program,
Hayes was to receive training in concrete finishing
and would be paid a percentage of the prevailing
wage that a concrete finisher receives. Hayes began
the OJT Program receiving a base pay rate of $8.00
per hour. On November 3, 1997, after completing
the OJT Program, Hayes received a raise to $9.50
per hour. Hayes also received a "Certificate of
Training," recognizing him as a concrete finisher.
Hayes received an additional merit raise, to $10.50
per hour, on April 27, 1998. On or about September
20, 1998, Hayes requested a raise from the Project
Superintendent, Tom Sperow ("Sperow"), stating
that other workers were earning more money than
he was for performing the same duties. [FN1]
Sperow replied that Hayes was being compensated
fairly and stated that the other workers were more
qualified than Hayes. On or about September 20,
1998, after he was denied the raise, Hayes
voluntarily resigned from Daisy.

> FN1. The workers Hayes referred to
> include, among others, Harold Thompson
> ("Thompson"), Charles Thomas
> ("Thomas"), and Benjamin Delong
> ("Delong"), who are all Caucasian males
> earning $14.00 per hour per the company's
> disclosure.

On December 1, 1998, approximately 3 months

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A-83

Slip Copy
2004 WL 2283597 (D.Del.)
(Cite as: 2004 WL 2283597 (D.Del.))

after he resigned, Hayes filed a claim of discrimination with the Delaware Department of Labor (the "DDOL"). In a report dated April 30, 1999, the DDOL found that Hayes was unable to support his allegations of discrimination based on race. (D.I. 39, at A7-A11). Further, the DDOL found that Hayes's witness supported Daisy's position and that Hayes was unable to show he was forced to resign because of his race. *Id.* The sole witness providing information was an African American employee who stated that Hayes was not forced to resign based on his race. The witness stated that other employees (Caucasian, African-American, Hispanic) were paid higher rates because they had more seniority and were in a Union. Moreover, the witness asserted that wages were determined by the employee's skill level and working experience, and described Hayes as having less experience and a "bad attitude" as a result of the wages he was receiving. Based on the evidence, the DDOL found no reasonable cause to believe that Daisy discriminated against Hayes with respect to race. *Id.* On December 4, 1998, Hayes filed a similar claim with the Equal Employment Opportunity Commission (the "EEOC"). In a "Dismissal and Notice of Rights" form, mailed on February 2, 2000, the EEOC adopted the findings of the DDOL.

**\*2** On January 28, 2002, Hayes filed a complaint with the court, pursuant to Title VII, 42 U.S.C. § 2000(e) *et seq.*, alleging racial discrimination for failure to compensate. Hayes subsequently amended his complaint on May 10, 2002 and August 13, 2002 to include the following additional claims: (1) failure to promote; (2) failure to pay at prevailing wages as to my classification as a concrete finisher; (3) failure to honor the contract; and (4) mental anguish, pain, and suffering. (D.I.12, 19). Hayes alleges that these claims arise from Daisy's racial discrimination against him. Daisy contends that the court should not consider the new allegations set forth in either of the amended complaints because Hayes did not file for leave of court pursuant to Rule 15(a) of the Federal Rules of Civil Procedure, despite Daisy allegedly notifying Hayes of his obligation to do so. The court will first determine whether it will allow the amended claims, and then determine whether Daisy's motion for summary judgment should be granted.

## III. STANDARD OF REVIEW

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Boyle v. County of Allegheny Pa.,* 139 F.3d 386, 392 (3d Cir.1998). Thus, summary judgment is appropriate only if the moving party shows there are no genuine issues of material fact that would permit a reasonable jury to find for the non-moving party. *Boyle,* 139 F.3d at 392. A fact is material if it might affect the outcome of the suit. *Id.* (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). An issue is genuine if a reasonable jury could possibly find in favor of the non-moving party with regard to that issue. *Id.* In deciding the motion, the court must construe all facts and inferences in the light most favorable to the non-moving party. *Id.; see also Assaf v. Fields,* 178 F.3d 170, 173-74 (3d Cir.1999). Moreover, the district court must read a *pro se* plaintiff's allegations liberally and apply a less stringent standard to the pleadings of a *pro se* plaintiff than to a complaint drafted by an attorney. *Marvel v. Snyder,* 2001 WL 830309, at \*2 (D.Del. July 24, 2001).

## IV. DISCUSSION

### A. Amending a Claim Pursuant to Rule 15 of the Federal Rules of Civil Procedure

Federal Rule of Civil Procedure Rule 15(a) states that "[a] party may amend the party's pleading once as a matter of course at any time before a responsive pleading is served ... otherwise a party may amend the party's pleadings only by leave of court ... and leave shall be freely given when justice so requires." Fed. R. Civ. P. 15(a) (2002). Rule 15 provides a flexible "basic policy statement," permitting the courts to freely allow parties to amend their pleadings. *Werner v. Werner,* 267 F.3d 288 (3d Cir.2001).

**\*3** As previously noted, Hayes filed his complaint on January 28, 2002. On April 1, 2002, Daisy filed its answer to the complaint. On May 10, 2002, Hayes filed a letter request (D.I.9) for entry of

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**A-84**

Slip Copy
2004 WL 2283597 (D.Del.)
(Cite as: 2004 WL 2283597 (D.Del.))

Page 3

default against Daisy. This request included a "Complaint" and "Amended Bill of Particulars," (collectively, the "First Amended Complaint") stating claims for failure to promote, failure to pay at prevailing wages, and failure to honor the contract. On June 14, 2002, Hayes filed a letter (D.I.12) apprising the court that he had submitted all pleadings to counsel for Daisy in a timely fashion. On July 15, 2002, Hayes filed a letter requesting that the court extend the deadlines for amending the pleadings and joinder of parties. The court granted Hayes's letter motion on July 29, 2002 and, through a scheduling order, set August 15, 2002 as the deadline for filing amended pleadings. Hayes again attempted to amend his complaint by filing an "Amended Bill of Particulars" (D.I.19) (the "Second Amended Complaint") on August 13, 2002, which set for the same claims as the First Amended Complaint. Daisy did not respond to either the First Amended Complaint or the Second Amended Complaint. Instead, Daisy wrote a letter to Hayes on June 25, 2002, explaining the requirements to amend a complaint pursuant to Rule 15(a) of the Federal Rules of Civil Procedure. Daisy contends that Hayes never filed an amended complaint in compliance with Rule 15(a). Therefore, Daisy asserts that the court should consider only Hayes's Title VII claim. [FN2]

> FN2. Daisy, however, has addressed Hayes's additional claims in the Defendant's Brief in Support of Its Motion for Summary Judgment (D.I.38).

In the present case, it appears that Hayes, a *pro se* plaintiff, requested an extension of the time to file an amended complaint, but did not understand that he should have filed a motion to amend his complaint. Daisy, in a letter to Hayes dated June 25, 2002, stated that it would agree to a stipulated order granting leave for Hayes to amend his complaint. Subsequently, Hayes filed the Second Amended Complaint, setting forth claims identical to those in the First Amended Complaint, dated May 10, 2002. Hayes asserts in the Second Amended Complaint that he requested leave of court in his July 15, 2002 letter. Hayes also asserts that his request was granted in the court's July 29, 2002 order. Thus, it is clear from the Second Amended Complaint that Hayes believed he had complied with Rule 15(a). In light of the foregoing, and considering the plaintiff's

*pro se* status and the liberal standard applied to Federal Rule of Civil Procedure 15(a), the court will consider the additional claims asserted by Hayes in his amended complaints. The court will first address Hayes's Title VII claims.

B. Title VII Racial Discrimination

Hayes has alleged that Daisy discriminated against him by failing to compensate him the same as Caucasian co-workers who performed the same duties. As noted subsequently, Hayes filed a First Amended Complaint and a Second Amended Complaint setting forth claims of additional discriminatory acts by Daisy. [FN3] In the Amended Complaints, Hayes claims that Daisy discriminated against him for failing to promote him. He also claims that he is entitled to relief for the following reasons: (1) failure to pay the prevailing wage as a concrete finisher; (2) failure to honor the contract; and (3) mental anguish, pain, and suffering. The failure to compensate and failure to promote claims fall under Title VII, 42 U.S.C. § 2000e-2. The court, therefore, will address only those claims in this section of the memorandum. Title VII prohibits an employer from discriminating against any individual on the basis of race, color, religion, sex or national origin:

> FN3. The First Amended Complaint (D.I.9), dated May 10, 2002, and the Second Amended Complaint (D.I.19), dated August 13, 2003, contain identical claims. For convenience, the court will address the claims of both amended complaints together, as the Amended Complaints.

*4 [i]t shall be an unlawful employment practice for an employer ... to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, sex, or national origin.

42 U.S.C. § 2000e-2(a). Discrimination claims under Title VII are analyzed under the three-step burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under *McDonnell Douglas*, a plaintiff must first establish a prima

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A-85

Slip Copy
2004 WL 2283597 (D.Del.)
(Cite as: 2004 WL 2283597 (D.Del.))

Page 4

facie case by demonstrating that he is a member of a protected class. The plaintiff must then establish that he was qualified for an employment position, but was not hired or was fired from the position "under circumstances that give rise to an inference of unlawful discrimination." *See Waldron v. SL Indus., Inc.,* 56 F.3d 491, 494 (3d Cir.1995). When the plaintiff establishes this prima facie showing, the burden shifts to the defendant to articulate one or more legitimate, non-discriminatory reasons for its employment decision. *Id.* If the defendant produces one or more legitimate reasons, the presumption of discrimination is rebutted. The plaintiff must then prove that the employer's reasons for its employment decision were pretextual--that is, that they are false and that the real reason for the employment decision was discriminatory. *Id.* Finally, if the plaintiff cannot carry the burden of proof under the shifting-framework established in *McDonnell,* the defendant is entitled to summary judgment. *Stafford v. Noramco of Delaware, Inc.,* 2000 WL 1868179, at *1 (D.Del. Dec.15, 2000).

1. Prima Facie Case

A prima facie discrimination case under Title VII requires the plaintiff to show that: (1) he is a member of a protected class; (2) he is qualified for the former position; (3) he suffered an adverse employment action despite being qualified; and (4) the action occurred under circumstances giving rise to an inference of unlawful discrimination, such as when non-members of the protected class are treated more favorably than the plaintiff. *Sarullo v. United States Postal Servs.,* 352 F.3d 789, 797 (3d Cir.2003); *Miller v. Delaware Dep't of Probation & Parole,* 158 F.Supp.2d 406, 410-11 (D.Del.2001). The court will consider each of Hayes's Title VII allegations in turn in order to determine whether Hayes has established a prima facie case of racial discrimination.

a. Discrimination Based on Failure to Compensate

Hayes alleges that Daisy discriminated against him by failing to compensate him at the same rate of pay as Caucasian co-workers who performed the same type of labor. In addition, Hayes makes allegations in his declaration concerning racial remarks, which he found offensive. Specifically, he alleges that white co-workers made jokes pertaining to African

Americans living in the cities, "referring to them as porch monkeys." (Declaration of Dale A. Hayes, D.I. 43). However, beyond his declaration Hayes does not provide any evidence to support these allegations. It is clear from the evidence in the record that Hayes satisfies the first three prongs of the burden-shifting regimen of *McDonnell Douglas.* Hayes, an African American, is a member of a protected class, was qualified for the cement finisher position he formerly held, and allegedly suffered an adverse employment action by not receiving a pay increase, which he alleges forced him to resign. The court, therefore, must determine whether the action occurred under circumstances giving rise to an inference of unlawful discrimination--that is, the court must determine whether non-members of the protected class were treated more favorably than Hayes. Circumstantial evidence of discrimination may include evidence "that the employer treated other, similarly situated persons not of his protected class more favorably." *Fuentes v. Perskie,* 32 F.3d 759, 765 (3d Cir.1994). "In determining whether similarly situated non-members of a protected class were treated more favorably than a member of the protected class, the focus is on the particular criteria or qualifications identified by the employer as the reason for the adverse action." *Simpson v. Kay Jewelers, Div. of Sterling, Inc.,* 142 F.3d 639, 647 (3d Cir.1998) (citing *Ezold v. Wolf, Block, Schorr & Solis-Cohen,* 983 F.2d 509, 528 (3d Cir.1993)). To survive summary judgment, "the plaintiff must point to evidence from which a factfinder could reasonably infer that the plaintiff satisfied the criterion identified by the employer or that the employer did not actually rely upon the stated criterion." *Simpson* 142 F.3d at 647 (citing *Fuentes,* 32 F.3d at 767).

*5 As an initial matter, it is worth noting that while Hayes claims he was "forced" to resign, he does admit that the decision to leave Daisy was voluntary and that no one implied that he should resign. (D.I.3). The crux of Hayes's position is that he was paid less than equally qualified co-workers for doing the same work. Hayes points to several Caucasian employees as examples of those performing the same duties as him but earning a higher base pay rate. Hayes alleges that he earned $8.00 per hour for non-contract work and $10.50 per hour for contract work as a base pay rate, compared to the $14.00 per hour for non-contract

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**A-86**

Slip Copy
2004 WL 2283597 (D.Del.)
(Cite as: 2004 WL 2283597 (D.Del.))

work and the $21.52 per hour for contract work that Thomas, Thompson, and Delong, among others, were earning for performing the same duties. (D.I. 39, at A8). Daisy, in response, cites Sperow's declaration, in which he asserts that the individuals cited by Hayes do not fall under the same category of employee and are not similarly situated in all aspects because they have additional skills that qualify them for a higher base pay rate. (D.I. 40 ¶ ¶ 7-11). For example, Thomas was hired both as a carpenter and a concrete finisher. Thompson is skilled in working with heavy equipment, is also a carpenter by trade, and has ten more years of experience in construction than Hayes. In addition to his concrete finishing experience, Delong has experience as a pipe layer and in setting up laser systems for pipe crews. Moreover, Daisy asserts that Sperow explained to Hayes that he was being fairly compensated and that as his skill level rose, so would his compensation. (D.I. 40 ¶¶ 17-18). Daisy also has provided evidence that other employees who perform finishing work and are members of the protected class earn base pay rate wages of up to $16 .00 per hour. (D.I. 40 ¶ 7). After reviewing the record evidence, the court concludes that Hayes was not similarly situated to the Caucasian concrete finishers because he does not have the same level of skill and experience. In light of the aforementioned facts, it cannot be said that the employees outside of the protected class were being treated more favorably than Hayes. Thus, Hayes cannot establish a prima facie case of race discrimination for failure to compensate. Because Hayes has not met his burden to establish a prima facie case, the court need not consider the other prongs of *McDonnell Douglas*. Daisy is entitled to summary judgment on Hayes's failure to compensate claim.

b. Discrimination Based on Failure to Promote

In the Amended Complaints (D.I.9, 19), Hayes alleges that Daisy failed to promote him. Daisy asserts that it is unsure exactly what Hayes's failure to promote claims are, but believes that Hayes is attempting to make a breach of contract claim based on a promise to promote by Daisy. The Third Circuit Court of Appeals has held that failure to promote claims are analyzed under the burden-shifting framework set forth in *McDonnell Douglas* Therefore, the court will not address

Daisy's assertion that Hayes's claim is one for breach of contract and is time-barred. Instead, the court will determine whether Hayes has established a prima facie case of discrimination for failure to promote.

*6 Hayes has satisfied the first three prongs for establishing a prima facie case based on Daisy's failure to promote him. First, Hayes is a member of a protected class. Second, he was qualified for the position (a promotion) following the OJT Program. Third, Hayes alleges that after taking a pay cut to participate in an OJT program, Daisy failed to promote him. Thus, the court must determine whether the failure to promote occurred under circumstances giving rise to an inference of unlawful discrimination. Hayes alleges that he was told by Daisy's project manager, Tom Miner ("Miner"), that after he completed the OJT program he would be recognized as a concrete finisher, would receive a merit pay increase, and would gain a permanent position with Daisy. Hayes alleges that after he completed the training program, his pay was reduced instead of increased. Hayes contends that Daisy's failure to promote him was race based. In response, Daisy argues that it fulfilled all of its alleged promises to Hayes. Hayes received a "Certificate of Training," recognizing him as a concrete finisher, and a memorandum congratulating him for completing the program. (D.I. 39, at A3-A4). In addition, Daisy asserts that Hayes received two pay increases after he completed the program. On November 3, 1997, upon completing the OJT Program, Hayes received a pay increase from $8.00 per hour to $9.50 per hour. Again, on April 27, 1998, Hayes received a merit raise to $10.50 per hour. (D.I. 39, at A2, A41-A42). Lastly, Daisy asserts that there is nothing in the record indicating that it did not intend to keep Hayes as a permanent employee. Instead, Daisy argues, it was Hayes who voluntarily resigned from Daisy due to what he maintained were intolerable conditions. The court finds Daisy's argument persuasive. The record fails to support the contention that Daisy did not fulfill its obligations to Hayes. Furthermore, Hayes has not pointed to any evidence showing that non-members of the protected class were treated more favorably in receiving promotions. Thus, Hayes is unable to show that not receiving a promotion from Daisy occurred under circumstances giving rise to an

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A-87

Slip Copy
2004 WL 2283597 (D.Del.)
(Cite as: 2004 WL 2283597 (D.Del.))

inference of unlawful discrimination. The court finds that Hayes cannot establish a prima facie case of racial discrimination for failure to promote. The court, therefore, will not consider the other prongs of *McDonnell Douglas.* Daisy is entitled to summary judgment on this claim.

## C. Amended Claims Asserted By Hayes

In addition to the Title VII claims for failure to compensate and failure to promote, Hayes seems to assert that he is entitled to relief for the following reasons: (1) failure to pay the prevailing wage as a concrete finisher; (2) failure to honor the contract; and (3) mental anguish, pain, and suffering. The court will address each of the claims in turn.

## 1. Failure to Pay the Prevailing Wage as a Concrete Finisher

Hayes claims that Daisy failed to pay him at prevailing wages as to his classification as a concrete finisher. Hayes asserts that Daisy knew he was above entry level and overqualified for the OJT Program. Hayes alleges that he worked: (1) 465.5 regular hours and 30 overtime hours as a cement finisher, resulting in a wage deficiency of $5,030.99; (2) 54 regular hours and two overtime hours as a carpenter, resulting in a wage deficiency of $584.24; and (3) 19.5 regular hours as an iron worker, resulting in a wage deficiency of $420.81. (D.I.9). Daisy contends that Hayes was paid according to the appropriate prevailing wage classification pursuant to the construction contract for the Toll Plaza Project, and that Hayes has admitted this. (D.I. 39 at A35-A36). As a result, Daisy argues that Hayes has not stated a claim under the Prevailing Wage Law, 29 Del. C. § 6960. Daisy further argues that summary judgment is proper on Hayes's claim for failure to pay the prevailing wage because it is time-barred. *See* 29 Del. C. § 6960(h).

*7 Viewing all of the evidence in the light most favorable to Hayes, the non-movant, the court finds that Daisy has satisfied the standard for an award of summary judgment. Hayes admitted at deposition that he was paid according to the prevailing wage classification under the construction contract for the Toll Plaza Project. Hayes cannot then maintain a claim under the Prevailing Wage Law, 29 Del. C. §

6960.

Regardless, even if Hayes could sustain his wage claim, the court finds that it is time-barred. The Delaware Prevailing Wage Law provides that no action to recover wages and damages shall be brought after the expiration of two years from the accruing of the cause of action. 29 Del. C. § 6960(h) . Hayes stated a claim for failure to pay prevailing wages in his First Amended Complaint, dated May 10, 2002. However, the Toll Plaza Project, on which Hayes alleges he worked as a cement finisher, carpenter, and iron worker, was completed in December of 1997. Thus, the Toll Plaza Project was completed almost five years before Hayes filed his claim for failure to pay prevailing wages. At a minimum, Hayes was aware of Daisy's alleged violation of the Prevailing Wage Law when he resigned from Daisy, in September 1998. Hayes, however, did not make this allegation until nearly four years later. Hayes's claim, therefore, is time-barred. For the foregoing reasons, the court will grant Daisy's motion for summary judgment.

## 2. Failure to Honor the Contract [FN4]

> FN4. It is not clear to the court whether Hayes is asserting that Daisy failed to honor his contract with Daisy or whether he is asserting that Daisy failed to honor its contract with the United States Department of Transportation. The court has used the term "honor the contract" in the previous sections of this Memorandum, and will continue to use the term here.

In his Amended Complaints, Hayes alleges that Daisy "knowingly refused and/or failed to honor [the] Contract which was agreed upon completion" of the Toll Plaza Project. (Amended Bill of Particulars, D.I. 9 ¶ 11). Hayes seems to argue that Daisy failed to promote him after completing the OJT Program, and, as a result of the failure to promote, thereby breached a contract between Hayes and the Federal Highway Administration. [FN5] At deposition, Hayes testified that the breach of contract that he was referring to in his Amended Complaints is Daisy's obligation to the United States Department of Transportation. Hayes testified that "[a]ccording to the federal highway regulations booklet, Daisy Construction Company

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**A-88**

Slip Copy
2004 WL 2283597 (D.Del.)
(Cite as: 2004 WL 2283597 (D.Del.))

was to insure the advancement of minority [men] and women." (D.I. 39, at A44). Daisy contends that Hayes has not provided any evidence to show that Daisy did not fulfill its obligations with respect to Hayes. Specifically, Daisy argues that it recognized Hayes as a concrete finisher, gave him two pay raises, and kept him employed at Daisy until he chose to leave. Daisy further asserts that even if a breach of contract action existed, it would be time-barred. Finally, Daisy asserts that Hayes does not have standing to sue based on Daisy's alleged obligations to the U.S. Department of Transportation because the regulations providing for the OJT program do not provide a private right of action for enrolled trainees.

> FN5. The court cannot discern from the plaintiff's Amended Complaints whether he is asserting a separate claim for breach of contract or whether he is asserting that the failure to honor the contract is a result of the failure to promote. The court will address Hayes's claim as one for breach of contract.

After reviewing all of the evidence, the court concludes that Hayes's breach of contract claim is time-barred by the applicable statute of limitations. The timeliness of a breach of contract action must be determined in accordance with the relevant state limitations for contractual actions. The statute of limitations in Delaware for breach of contract is three years. 10 Del. C. § 8106. Hayes was aware of the alleged failure to honor the contract, at a minimum, in September 1998, when he resigned. However, Hayes did not raise this claim until the First Amended Complaint, dated May 10, 2002, nearly four years after he was aware of the alleged breach. Thus, due to Hayes's undue delay in asserting a claim for failure to honor the contract, the court will grant Daisy's motion for summary judgment.

3. Mental Anguish, Pain, and Suffering

*8 Finally, Hayes alleges that he suffered metal anguish, pain, and suffering as a result of Daisy's actions. The court must conclude, however, that there is no genuine issue of material fact as to this contention, since Hayes has adduced no evidence to support it. Additionally, because the court will grant

Daisy's motion for summary judgment on all claims, the issue of damages is denied as moot.

*ORDER*

For the reasons stated in the court's Memorandum Opinion of this same date, IT IS HEREBY ORDERED that:

1. The defendant's Motion for Summary Judgment (D.I.37) is GRANTED.

2004 WL 2283597 (D.Del.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**A-89**

Westlaw.

Not Reported in F.Supp.2d
2002 WL 1263999 (N.D.Ill.)
(Cite as: 2002 WL 1263999 (N.D.Ill.))

Page 1

C
Only the Westlaw citation is currently available.

United States District Court, N.D. Illinois, Eastern
Division.
Eddie Mae MARCUS, Plaintiff,
v.
Togo D. WEST, Jr., Secretary of Veterans Affairs,
John J. DeNardo, Director of
Edward J. Hines Jr. Hospital, and Sharon Firlit
Zandell, Director of Health
Care Education, Edward J. Hines, Jr. Hospital,
Defendants.
No. 99 C 0261.

June 3, 2002.

*MEMORANDUM AND ORDER*

MANNING, J.

**\*1** Plaintiff Eddie Mae Marcus filed this action,
pursuant to Title VII of the Civil Rights Act of
1964, 42 U.S.C.2000e et seq., alleging that
Defendants discriminated against her and created a
hostile work environment based on her race (Count
II) and religion (Count III) and that she was
retaliated against (Count I) for filing a
discrimination complaint with the Department of
Veterans Affairs, Office of Employment
Discrimination Complaint Adjudication ("the
Department"). The instant matter comes before the
Court on Defendant Secretary of Veterans Affairs'
("the Secretary") Motion for Summary Judgment,
pursuant to Federal Rule of Civil Procedure 56 .
[FN1] For the following reasons, the Secretary's
Motion for Summary Judgment is GRANTED IN
PART as to Counts II and III AND DENIED IN
PART as to Count I.

> FN1. Although the Motion for Summary
> Judgment is styled as being brought by the
> Secretary, and does not specifically state
> that it is brought by the other two
> Defendants, because it addresses

allegations against the other Defendants,
the Court will treat it as a motion for
summary judgment for the claims against
all three Defendants.

BACKGROUND [FN2]

FN2. The facts in the Background section
are derived from the parties' Local Rule
56.1 statements and other pleadings. The
facts in the Secretary's Local Rule
56.1(a)(3) statement that Ms. Marcus did
not controvert in her Local Rule
56.1(b)(3)(A) statement are deemed
admitted for purposes of this motion.
*Schultz v. Serfilco, Ltd.,* 965 F.2d 516, 519
(7th Cir.1992). Likewise, the facts that Ms.
Marcus provides in her Local Rule 56.1
statement that the Secretary did not
controvert are also deemed admitted. *Id.*

Ms. Marcus has been employed by the Veteran's
Administration ("VA") as a secretary in the Health
Care Education Services Department ("HCESD") of
the Edward J. Hines, Jr. Hospital ("Hines Hospital")
since 1996, and has worked for the VA since 1978.
Ms. Marcus is an African-American and a
Sanctified Pentecostal Christian. Her supervisor,
Dr. Sharon Firlit Zandell, Ph.D., who is the Director
of the HCESD, is a Caucasian and a Roman
Catholic. The other clerical employee assigned to
HCESD, Vivian Svaldi, is also a Caucasian and a
Roman Catholic, as is Joann Jaycox, the
Coordinator of the HCESD.

Dr. Zandell supervises both Ms. Marcus and Ms.
Svaldi and, along with Ms. Jaycox, is responsible
for allocating work to each. This situation appears
to have led to Ms. Marcus having multiple
assignments, sometimes with conflicting deadlines,
and to a lack of clear priorities in her assignments.
Ms. Jaycox has had difficulty in assigning Ms.
Marcus work, and, on at least one occasion, they
have had a heated argument about work
distribution. During one incident, Ms. Jaycox
became fearful of Ms. Marcus and called the Hines

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A-90

Not Reported in F.Supp.2d
2002 WL 1263999 (N.D.Ill.)
(Cite as: 2002 WL 1263999 (N.D.Ill.))

Page 2

Hospital Police.

Though Ms. Marcus and Ms. Svaldi both perform clerical functions, they have different titles and pay grades. Ms. Marcus is paid on a "secretary" and is paid on general scale five (GS-5), while Ms. Svaldi is a "clerk typist" and is paid on the lower GS-4 scale. Their job descriptions differ mainly in the areas of the department which they are assigned to support. Ms. Marcus is responsible for the affiliation program for nursing students, including student contact, tuition reimbursement, and continuing education, whereas Ms. Svaldi is responsible for the orientation program.

Ms. Marcus contends that Dr. Zandell was prejudiced against her because of her race (African-American) and her religion (Sanctified Pentecostal). Because of this prejudice, Ms. Marcus alleges that Dr. Zandell discriminated against her by unjustly allocating work to her, delaying her performance evaluations, preventing her from receiving performance-based bonuses by giving her low performance ratings, preventing her from taking advantage of training opportunities within Hines Hospital, and thwarting her attempts to transfer out of the HCESD. Furthermore, Ms. Marcus alleges that Ms. Jaycox harassed and discriminated against her by calling the police in response to the altercation described above.

*2 In April, 1997, Ms. Marcus complained of this perceived discriminatory behavior to Dr. Zandell and demanded changes in her work environment, a clarification of her duties, and a new manner of assigning her duties which would prioritize work and deadlines. Despite airing her grievances, Ms. Marcus felt that her work situation had not improved and took her complaint to the head of the Research and Education Service, Dr. Victor Terranova. Dr. Terranova arranged for a temporary transfer of Ms. Jaycox and told Ms. Marcus that she could transfer to another area of the hospital, but that, due to a budget freeze, she could do so if only she was willing to take a temporary position which would make her subject to "bumping" during a reduction in force. Ms. Marcus declined to accept such a position. Dr. Terranova also instructed Dr. Zandell to contact Ms. Olivia Garth in Hines Hospital's EEO/Affirmative Action department.

Pursuant to Dr. Terranova's request, Dr. Zandell contacted Ms. Garth, who conducted an investigation, interviewed the parties, and attempted to mediate a resolution to Ms. Marcus' complaints. Based on her investigation and attempts at mediation, she concluded that the problems in the HCESD stemmed from a failure of communication between those who worked there and Dr. Zandell's abrupt style of communicating and managing her employees. She negotiated a temporary truce between the women, but this did not hold. Ms. Marcus alleges that, in her attempts to mediate, Ms. Garth exploited Ms. Marcus' religious beliefs by asking her, along with Dr. Zandell and Ms. Jaycox, to swear on a Bible to resolve their differences. Ms. Garth denies using a Bible in her mediation attempts.

Ms. Marcus subsequently contacted another VA EEO counselor about her desire to transfer to another area of Hines Hospital, and on August 26, 1997, filed her first discrimination complaint with the Department. After the investigation that followed, the Department reached substantially the same conclusions as Ms. Garth--that the problems in the HCESD stemmed from a lack of communication and from Dr. Zandell's abrupt style of management.

In December, Ms. Marcus filed a second complaint with the Department, alleging that she was retaliated against for filing her initial discrimination complaint. After filing her initial complaint, Ms. Marcus made repeated but unsuccessful attempts to transfer out of the HCESD to another position within Hines Hospital or to another government agency. Ms. Marcus contends that her inability to transfer was due either to prejudice against her because of her race or religion or to her filing of a discrimination complaint with the Department.

After the Department investigated both of her complaints, it notified Ms. Marcus in writing of her right to request either a hearing before an ALJ followed by a final decision by the Department, or a final decision by the Department without a hearing. Ms. Marcus failed to respond to the Department's notification of her right to a hearing, and therefore, her complaints were submitted to the Department for a final agency decision based on the investigative record. After reviewing the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A-91

Not Reported in F.Supp.2d
2002 WL 1263999 (N.D.Ill.)
(Cite as: 2002 WL 1263999 (N.D.Ill.))

Page 3

investigative record, ALJ Charles R. DeLobe, issued a "Final Agency Decision" concluding that Ms. Marcus had not been harassed or discriminated against on the basis of race, religion, or disability, or retaliated against for filing a discrimination complaint with the Department.

**\*3** Ms. Marcus subsequently filed this suit in January, 1999, alleging that Defendants discriminated against her and created a hostile work environment based on her race (Count II) and religion (Count III) and that she was retaliated against (Count I) for filing a complaint with the Department regarding the alleged discrimination . [FN3]

> FN3. In contrast to her complaint with the Department, Ms. Marcus' Second Amended Complaint does not allege discrimination based on her alleged disability. The Court will thus not address this issue.

### STANDARD OF REVIEW

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). *See also Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23; *Cheek v. Western & Southern Life Ins. Co.,* 31 F.3d 497, 500 (7th Cir.1994). A genuine issue of material fact is one that might affect the outcome of the lawsuit, and factual disputes that are irrelevant will not be considered. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986). In determining whether a genuine issue of material fact exists, the court must construe the alleged facts in a light most favorable to the party opposing the motion. *U.S. v. Diebold, Inc.,* 369 U.S. 654, 655 (1962); *Dale v. Chicago Tribune Co.,* 797 F.2d 458, 460 (7th Cir.1986).

The moving party carries the initial burden of establishing that no genuine issue of material fact exists. Fed.R.Civ.P. 56(c); *Celotex Corp.,* 477 U.S. at 323. Once the moving party has met its burden, the nonmoving party must set forth specific facts showing that there is a genuine issue for trial. Fed.R.Civ.P. 56(e); *Becker v. Tennenbaum Hill*

*Assoc., Inc.,* 914 F.2d 107, 110 (7th Cir.1990). The nonmoving party must do more than "show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986), and may not merely rest upon the allegations or denials in its pleading, but instead must "set forth specific facts showing that there is a genuine issue for trial." *Anderson,* 477 U.S. at 248. If the evidence presented is "merely colorable" or is not "significantly probative," summary judgment may be granted. *Id.* at 250-51 (citations omitted). The court considers the record as a whole, and draws all reasonable inferences in the light most favorable to the nonmoving party. *Regner v. City of Chicago,* 789 F.2d 534, 536 (7th Cir.1986).

Courts are cautious in granting summary judgment in employment discrimination cases because often issues of intent and credibility are involved. *Sarsha v. Sears, Roebuck & Co.,* 3 F.3d 1035, 1038 (7th Cir.1993); *McCoy v. WGN Continental Broadcasting Co.,* 957 F.2d 368, 370-71 (7th Cir.1992). Summary judgment is inappropriate if the court must balance conflicting indications of motive and intent. *Stumph v. Thomas & Skinner, Inc.,* 770 F.2d 93, 97 (7th Cir.1985). An employer can only prevail at the summary judgment stage if the record shows that a reasonable trier of fact must conclude that the employment decision was not based on discrimination. *Veprinsky v. Fluor Daniel, Inc.,* 87 F.3d 881, 893-94 (7th Cir.1996).

### ANALYSIS

**\*4** The Secretary has moved for summary judgment of Ms. Marcus' Second Amended Complaint on the grounds that Ms. Marcus has failed to make a prima facie showing that: (1) she suffered adverse employment action or a hostile work environment; (2) the Secretary treated similarly situated individuals more favorably; (3) there was a causal link between her protected activity and any employment action; and (4) the Secretary's explanations are pretextual. The Court will address each of these contentions as they apply to Ms. Marcus' allegations of: (I) discrimination; (II) hostile work environment; and (III) retaliation.

I. Racial and Religious Discrimination

To establish a prima facie case of race and

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A-92

Not Reported in F.Supp.2d
2002 WL 1263999 (N.D.Ill.)
(Cite as: 2002 WL 1263999 (N.D.Ill.))

religious discrimination, a plaintiff must show that: (1) she belongs to a protected group; (2) she performed her job satisfactorily; (3) she was subjected to an adverse employment action; and (4) the employer treated similarly situated employees more favorable. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802 (1973); *Johnson v. City of Fort Wayne, Ind.,* 91 F.3d 922, 931 (7th Cir.1996). Here, there is no dispute that Ms. Marcus is a member of a protected group (African-American and Sanctified Pentecostal Christian) and that she performed her job satisfactorily. Therefore, the Court will only examine the last two prongs of the *McDonnell Douglas* requirements.

Adverse employment action has been broadly defined by the Seventh Circuit, and is not limited to actions with an economic effect on the plaintiff. *Smart v. Ball State Univ.,* 89 F.3d 437, 441 (7th Cir.1996). This inclusive definition, however, is not without limit. "While adverse employment actions extend beyond readily quantifiable losses, not everything that makes an employee unhappy is an actionable adverse action. Otherwise, minor and even trivial employment actions that 'an irritable, chip-on-the-shoulder employee did not like would form the basis of a discrimination suit." ' *Id.* ( *quoting Williams v. Bristol-Myers Squibb Co.,* 85 F.3d 270, 274 (7th Cir.1996)). Thus, while an employee's subjective experience is not unimportant to this analysis, neither is it the defining variable in determining whether retaliation has occurred. *Uhl v. Zalk Josephs Fabricators, Inc.,* 121 F.3d 1133, 1137 (7th Cir.1997) ( "Facts, not an employee's perceptions and feelings, are required to support a discrimination claim").

Moreover, poor treatment of an employee alone is not enough to establish that the employer is discriminating or retaliating against the employee. As noted by the Seventh Circuit, "Title VII is not directed against unpleasantness per se but only ... against discrimination in the conditions of employment." *Carr v. Allison Gas Turbine Div., Gen. Motors Corp.,* 32 F.3d 1007, 1009 (7th Cir.1994). Courts "are in no position to measure, or much less evaluate, whether an employer speaks to its workers too harshly." *Robin v. Espo Engr. Corp.,* 200 F.3d 1081, 1091 (7th Cir.2000). Instead, courts are " 'empowered to decide legal issues'

alone, and not the 'troubling social as well as ethical questions that go well beyond the legal issues' ..." and must instead leave "these 'greater social questions' to be 'decided by the political branches of government." ' *Id.* at 1092. Moreover, in evaluating an employer's conduct, a court may not sit as a " 'super-personnel department," ' but must limit itself to determining whether the employee's protected conduct was a "substantial or motivating factor" in the employer's decision to take the adverse action alleged. *Stagman v. Ryan,* 176 F.3d 986, 1002 (7th Cir.1999) (citation omitted).

**\*5** In addition, the plaintiff must show that similarly situated employees were treated differently. *Radue v. Kimberly-Clark Corp.,* 219 F.3d 612, 618 (7th Cir.2000). This requirement is crucial, because "without it a plaintiff would only have to point to one ... employee who was treated better than he ... [which] would be meaningless, especially with respect to large corporations ..." *Id.* at 619. To meet the "similarly situated requirement, the plaintiff must show that "there is someone who is directly comparable to her in all material respects." *Patterson v. Avery Dennison Corp.,* 281 F.3d 676, 680 (7th Cir.2002). In determining whether other employees are "similarly situated," the court "must look to all relevant factors," the number of which depend on the context of the case. *Radue,* 219 F.3d at 617. Some of the relevant factors include whether the employees "dealt with the same supervisor," "subject to the same standards," and whether they had comparable "experience, education and qualifications," provided that the employer took these factors into account when making employment decisions. *Id.* at 617-18.

Once the plaintiff establishes a prima facie case of discrimination, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for its conduct. *McDonnell Douglas,* 411 U.S. at 802-03. The defendant's burden at this point is one of production only, not one of persuasion. *Reeves v. Sanderson Plumbing Prod., Inc.,* 530 U.S. 133, 142 (2000). To satisfy this burden, the defendant need only offer "admissible evidence which would allow the trier of fact to rationally conclude that the employment decision had not been motivated by discriminatory animus." *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 257 (1981). By

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**A-93**

Not Reported in F.Supp.2d
2002 WL 1263999 (N.D.Ill.)
(Cite as: 2002 WL 1263999 (N.D.Ill.))

meeting its burden of production, the burden shifts back to the plaintiff, who must then prove that the proffered reason is false or pretextual. *McDonnell Douglas,* 411 U.S. at 804-05.

To show a legitimate, non-discriminatory reason for its conduct, a defendant need not show that it had a good reason for its conduct, but only that its reason was not discriminatory. *Timm v. Mead Corp ., 32* F.3d 273, 275 (7th Cir.1994). "Thus, when all legitimate reasons for rejecting an applicant have been eliminated as possible reasons for the employer's actions, it is more likely than not the employer, who we generally assume acts only with some reason, based his decision on an impermissible consideration such as race." *Furnco Constr. Corp. v. Waters,* 438 U.S. 567, 577 (1978). Moreover, when hiring decisions are involved, the employer need not show that the person chosen over the plaintiff had superior qualifications, so long as the decision is not based on unlawful criteria. *Burdine,* 450 U.S. at 259 (the fact that a court may think that the employer misjudged the qualifications of the applicants does not itself expose him to Title VII liability, although this may be probative of whether the employer's reasons are pretexts for discrimination).

*6 Here, Ms. Marcus contends that Dr. Zandell discriminated against her by: (1) delaying her performance evaluations; (2) preventing her from receiving performance-based bonuses by giving her low performance ratings; (3) unjustly allocating work to her; (4) preventing her from taking advantage of training opportunities within Hines Hospital; (5) sending threatening e-mails; and (6) thwarting her attempts to transfer out of the HCESD. [FN4] Furthermore, Ms. Marcus alleges that Ms. Jaycox harassed and discriminated against her by unjustly calling the Hines Hospital Police after they had an argument. The Court will apply the above relevant standards to each of these allegations separately.

> FN4. The Second Amended Complaint also alleges the Dr. Zandell discriminated against her by refusing to allow her to adjust her work schedule to attend night school, even though Dr. Zandell made such allowances for Caucasian employees. Although not discussed by either of the

parties, this Court finds that this allegation does not meet the prima facie burden because Ms. Marcus has not put forth any evidence to show that this decision was an adverse employment action or that similarly situated employees were allowed time off to attend night school.

First, Ms. Marcus contends that Dr. Zandell's delay in completing Ms. Marcus' performance evaluation and rating Ms. Marcus' work performance as "fully satisfactory" indicate retaliatory and discriminatory conduct. [FN5] Under the *McDonnell Douglas* burden shifting framework, the Secretary need only offer a legitimate, non-discriminatory reason to shift the burden back to Ms. Marcus, who must then show that this conduct was discriminatory in spite of the reason articulated. The Secretary has offered detailed explanations for Dr. Zandell's employment decisions regarding Ms. Marcus' evaluations. For example, Dr. Zandell delayed Ms. Marcus' evaluation to allow her time to assess Ms. Marcus' proficiency in Microsoft Word and Excel. Moreover, the record indicates that, while the evaluation might have been completed later than Ms. Marcus would have wished, it was completed within the period allowed by Hines Hospital for such evaluations, and that the tardy submission did not result in any adverse consequences for Ms. Marcus. Likewise, Dr. Zandell justified her "fully satisfactory" rating of Ms. Marcus by stating that, while Ms. Marcus was performing her duties in an acceptable manner, she frequently found spelling and formatting errors in Ms. Marcus' work.

> FN5. In April 1997, Hines Hospital changed its performance evaluation system from a five-tiered system running from "outstanding" to "unacceptable" to a two-tiered system of "successful" or "unacceptable." Under the five-tiered system, Dr. Zandell consistently rated Ms. Marcus "fully satisfactory," the middle category, and under the two-tiered system consistently rated her "successful."

By offering these explanations, the Secretary has shifted the burden back to Ms. Marcus. Ms. Marcus, however, has not contradicted these explanations, nor offered this Court any evidence that shows that these explanations are false or pretextual. Likewise,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**A-94**

Not Reported in F.Supp.2d
2002 WL 1263999 (N.D.Ill.)
(Cite as: 2002 WL 1263999 (N.D.Ill.))

Page 6

neither the ALJ nor the EEO investigator found any indication that the delay in completing the evaluations or the evaluations themselves constituted discrimination.

Moreover, even if Dr. Zandell's evaluations of Ms. Marcus were unjustified, negative performance evaluations alone are generally not sufficient to support a Title VII claim, particularly where the employee is not automatically entitled to a bonus. *See Oest v. Ill. Dept. of Corrections,* 240 F.3d 605, 613 (7th Cir.2001); *Speer v. Rand McNally & Co.,* 123 F.3d 658, 664 (7th Cir.1997); *Rabinovitz v. Pena,* 89 F.3d 482, 488-89 (7th Cir.1996); *Smart,* 89 F.3d at 488-89.

Thus, because this Court finds that Ms. Marcus has failed to show adverse employment action or that the Secretary's employment decisions were pretextual, this Court holds that Ms. Marcus has failed to sufficiently demonstrate as a matter of law that she was discriminated against based on her performance evaluations.

**\*7** Additionally, Ms. Marcus contends that, because of the evaluations discussed above, she did not receive monetary bonuses which are awarded to employees whose job performance is rated "outstanding." Hines Hospital's practice was to award monetary bonuses to employees whose evaluations indicated "outstanding" performance, and Ms. Marcus argues that its failure to award her a bonus, while awarding her co-worker, Ms. Svaldi, a bonus, is evidence of discrimination and retaliation. As discussed above, this Court finds that Ms. Marcus has failed to prove that she was discriminated against based on her performance evaluations, and therefore, her not receiving a bonus based on these evaluations likewise does not constitute discrimination.

Moreover, this Court finds that Ms. Marcus has failed to present any evidence which would support a finding that she and Ms. Svaldi are "similarly situated" employees. Ms. Marcus has only shown that one employee, Ms. Svaldi, received a performance bonus. However, Ms. Marcus has failed to show that Ms. Svaldi is similarly situated. As explained above, their job titles, descriptions, and responsibilities differ and their positions are on different pay scales. Ms. Marcus is a "secretary"

with responsibilities for the affiliation program for nursing students and is paid on the GS-5 pay scale. Ms. Svaldi, on the other hand, is a "clerk typist" with responsibilities for the orientation program and is paid on the lower GS-4 pay scale. Their distinct work responsibilities and different pay grades indicate that they are not similarly situated vis-a-vis one another with respect to Dr. Zandell's evaluations of their performance.

Additionally, the Seventh Circuit has held that, where an employee is not automatically entitled to a monetary bonus, the loss of that bonus is not an adverse employment action. *Rabinovitz,* 89 F.3d at 488-89; *Smart,* 89 F.3d at 488-89. Accordingly, Dr. Zandell's ratings of Ms. Marcus and the VA's consequent failure to award her bonuses cannot be construed as an adverse employment action.

Ms. Marcus also contends that the additional work assigned to her by Dr. Zandell and Ms. Jaycox constituted discrimination and retaliation against her. However, an "employee doesn't get to write his own job description," *Palucki v. Sears, Roebuck & Co.,* 879 F.2d 1568, 1571 (7th Cir.1989), and "it is no business of a court in a discrimination case to decide whether an employer demands 'too much' of his workers" so long as the expectations and demands are not discriminatory or retaliatory. *Coco v. Elmwood Care, Inc.,* 128 F.3d 1177, 1179 (7th Cir.1997).

Here, Dr. Zandell has articulated a clearly non-discriminatory and non-retaliatory reason for Ms. Marcus' increasing workload: she explained that, when Ms. Marcus first started in the HCESD, she wanted to allow Ms. Marcus time to adjust to her new position and learn it before all the duties in her position description were transferred to her by Dr. Zandell also explained that, because Ms. Marcus' position had been vacant for a substantial time before Ms. Marcus filled it, Ms. Svaldi and others in the HCESD had all picked up the work for that position.

**\*8** While a decrease in workload and job responsibilities may be evidence that an employee has been discriminated or retaliated against, *Dahm v. Flynn,* 60 F.3d 253 (7th Cir.1995), progressively assigning a new employee the duties encompassed in her job description cannot support a claim of

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A-95

Not Reported in F.Supp.2d
2002 WL 1263999 (N.D.Ill.)
(Cite as: 2002 WL 1263999 (N.D.Ill.))

Page 7

discrimination or retaliation. *See Coco*, 128 F.3d at 1179. Moreover, as detailed above, because Ms. Marcus was paid at a full pay grade above Ms. Svaldi, Ms. Marcus cannot prove that a similarly situated employee was treated more favorably than she was.

Next, Ms. Marcus contends that Dr. Zandell discriminated and retaliated against her by preventing her from taking advantage of training opportunities within the VA. To show that she was discriminated against as to training opportunities, Ms. Marcus must show that she was denied access to training allowed to other similarly situated employees. However, as discussed above, Ms. Svaldi, to whom Ms. Marcus compares herself, is not similarly situated with respect Ms. Marcus, and therefore, she cannot make a prima facie case of discrimination. *Radue*, 219 F.3d at 618.

However, even if the Court grants that, for this purpose, Ms. Marcus and Ms. Svaldi are similarly situated, the record undermines rather than supports Ms. Marcus' allegations. Hines Hospital's employee training records indicate that between September 1, 1995 and September 30, 1997, Ms. Marcus completed 93 hours of training within the VA system, whereas Ms. Svaldi completed only 28 hours in the same period. Under these facts, Ms. Marcus cannot seriously contend that she was retaliated against in her access to training opportunities.

Moreover, the one class that Ms. Marcus was not allowed to attend, which Ms. Svaldi did, focused on the "ETS" system which Ms. Svaldi used for the majority of her work. Dr. Zandell explained that Ms. Marcus was needed to perform secretarial duties while Ms. Svaldi was at the training, but that Ms. Marcus was free to take the course at a later date. Again, Ms. Marcus has done nothing to indicate that this explanation is false or pretextual, and therefore could survive summary judgment under *McDonnell Douglas*, 411 U.S. at 802.

Ms. Marcus also contends that e-mails from Dr. Zandell demonstrate that she was discriminated and retaliated against. To support this claim, she attaches copies of three e-mails, but only two of those are from Dr. Zandell. These e-mails, however, state that they are "formal counseling" and simply express Dr. Zandell's dissatisfaction with Ms. Marcus' work performance and attitude, and explicitly state that they will *not* be placed in her personnel file. Thus, because the e-mails were not placed in her file, they do not constitute an adverse employment action. *Ribando v. United Airlines, Inc.*, 200 F.3d 507, 510-11 (7th Cir.1999).

Ms. Marcus further contends that the fact she was denied a transfer to a different position within Hines Hospital and other government agencies shows that she was discriminated and retaliated against. Ms. Marcus applied, via an undated letter to the Hines Human Resources Department, for various clerical positions within Hines Hospital. She also requested a transfer during a May 2, 1997 meeting with the ACOS for Research and Education Service, Dr. Terranova. On May 20, Dr. Terranova replied, stating that, due to a funding freeze, no permanent transfers were available at that time, and that, while she could transfer to a temporary position, she might be "bumped" to a different area during a reduction in force. In response to Dr. Terranova's letter, Ms. Marcus wrote to Brian House, an EEO counselor at Hines, stating that "I trully [sic] do not want to be placed into a temporary position. I like the work that I am doing and know that I am doing it very well." She further stated that her work atmosphere had improved, though she still felt she was being treated unfairly and wanted to proceed with her complaint to the Department. Thus, for these positions, at least, Ms. Marcus cannot argue that she was denied the position(s) for which she applied; rather, she rejected them herself because they were temporary positions and would make her subject to bumping during a reduction in force. [FN6]

> FN6. As for Ms. Marcus' contention that Ms. Jaycox successfully transferred out of HCESD, the record reveals that Ms. Jaycox transferred to a temporary position within Hines--precisely the kind of position which Ms. Marcus refused to accept.

**\*9** Moreover, in his deposition, Michael Huck, who is both the Administrative Officer for the Educational Division of Hines' Research and Education service and the Section Chief of the Staff Development and Training Section of the Education

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A-96

Not Reported in F.Supp.2d
2002 WL 1263999 (N.D.Ill.)
(Cite as: 2002 WL 1263999 (N.D.Ill.))

Page 8

Division, explained why Ms. Marcus was not selected for another of the positions for which she applied: [FN7] He stated

> FN7. Mr. Huck was unable to remember the title of the position for which Ms. Marcus applied, but stated that it was either program assistant or program analyst, that the position was secretarial in nature, and that it was on the GS-6 salary scale.

I did a performance based interviewing thing with all my candidates, and I had what they call a right person profile of what the ideal candidate would look like. And then I took my information from all of the candidates and lined it up against that, and there were two candidates that had met all the right person kind of things, all the knowledge, skills, abilities that were higher than her for that.
I offered the position to one person from outside the VA, they didn't take it. Then I took the next person down, and they took it.
(Huck 26:6-17 (Mar. 9, 2001).) The Secretary has, therefore, articulated a legitimate, non-discriminatory reason for not hiring Ms. Marcus for this position, and thereby shifted the burden back to Ms. Marcus. Ms. Marcus, however, has failed to show that this explanation is false, and therefore, cannot survive summary judgment with respect to this allegation. Moreover, the Court notes that, in one case, according to Ms. Marcus' own testimony, the position for which she applied was filled by an African-American man.

As to possible employers outside of the VA, Ms. Marcus does not provide information for this Court to assess her applications with respect to her applications to the Immigration and Naturalization Department and the Census Bureau. Moreover, even if she had, it is for those agencies, not the Secretary, to explain or defend their hiring decisions.

Finally, Ms. Marcus alleges that Ms. Jaycox harassed and discriminated against her by unjustly calling the Hines Hospital Police after they had an argument. The Director contends that Ms. Jaycox called the Hines police because she was frightened of Ms. Marcus as a result of the argument. Because the police did not take any action against Ms.

Marcus and because Ms. Marcus has not shown that Ms. Jaycox's decision to call the police was pretextual, this Court finds that this incident does not constitute actionable discrimination.

Accordingly, the Court finds that summary judgment is appropriate as to Ms. Marcus' claims for discrimination because: (1) Ms. Marcus has failed to demonstrate adverse employment action or that the Secretary treated similarly situated employees more favorably; and (2) even if she could demonstrate these requirements, Ms. Marcus has failed to demonstrate that the Director's legitimate, non-discriminatory reasons explaining the conduct about which Ms. Marcus complains is pretextual.

## II. Racial and Religious Harassment

Ms. Marcus also alleges that she was harassed because of her race and religion. To establish a prima facie case of racial and religious harassment, a plaintiff must show: (1) harassment because of her membership in a protected class, *Oncale v. Sundowner Offshore Serv., Inc.,* 523 U.S. 75, 81 (1997), that (2) was severe and pervasive enough to alter the plaintiff's working conditions, *Meritor Savings Bank v. Vinson,* 477 U.S. 57, 67 (1986), (3) which was unwelcome, *id.* at 68, and (4) the employer did not act promptly to effectively correct or prevent the harassment. *Saxton v. Am. Tel. & Tel. Co.,* 10 F.3d 526, 535-36 (7th Cir.1993).

*10 In *Meritor,* the Supreme Court established that "[f]or sexual harassment to be actionable, it must be sufficiently severe or pervasive to 'alter the conditions of the victim's employment and create an abusive work environment." ' 477 U.S. at 67 (citation omitted). However, the Court has also noted that
    ... Title VII comes into play before the harassing conduct leads to a nervous breakdown. A discriminatory abusive work environment, even one that does not seriously affect employees' psychological well-being, can and often will detract from employees' job performance, discourage employees from remaining on the job, or keep them from advancing in their careers.
*Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 22 (1993) . While the Court has been sympathetic to harassment claims, it has also expressed the desire

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A-97

Not Reported in F.Supp.2d
2002 WL 1263999 (N.D.Ill.)
(Cite as: 2002 WL 1263999 (N.D.Ill.))

to limit Title VII's applicability to conduct which is actually hostile and discriminatory: "the plaintiff ... must always prove that the conduct at issue was not merely tinged with offensive ... connotations, but actually constituted '*discrimination* ... because of ... [membership in the protected class]." ' *Oncale,* 523 U.S. at 81 (emphasis in original).

In determining whether conduct is severe and pervasive enough to alter the conditions of employment and create a hostile work environment, courts consider both the actual effect of the conduct on the plaintiff (the subjective test) and what the effect would be on a reasonable person in the plaintiff's position (the objective test). *Rodgers,* 12 F.3d at 674. Whether conduct is objectively hostile or abusive must be determined "by looking [at the conduct under] all the circumstances." *Harris,* 510 U.S. at 23. Factors that are relevant in determining whether a reasonable person would find conduct hostile are the frequency of the conduct, its severity, whether it is "physically threatening or humiliating, or a mere offensive utterance," and whether it interferes with the employee's work performance. *Id.* The Seventh Circuit has held that isolated remarks or incidents are insufficient to establish a hostile work environment. *Filipovic v. K & R Exp. Sys., Inc.,* 176 F.3d 390, 398 (7th Cir.1999) (four national origin related comments made over the course of more than a year not sufficient to create a hostile environment) (*Rabinovitz,* 89 F.3d at 489 ("an employee may not be unreasonably sensitive to his working environment"); *Saxton,* 10 F.3d at 535 ("inaccessibility, condescension, impatience, and teasing" were " 'merely offensive' "); *North v. Madison Area Assn. for Retarded Citizens--Dev. Centers Corp.,* 844 F.2d 401, 409 (7th Cir.1988) (sporadic use of racial epithets and slurs were insufficient to support a Title VII claim). However, repeated instances of such conduct may be aggregated to support a hostile environment claim. *Hostetler v. Quality Dining, Inc.,* 218 F.3d 798, 808 (7th Cir.2000) ("There is no 'magic number' of incidents required to establish a hostile environment").

*11 Here, Ms. Marcus is clearly a member of a protected class, and the parties do not dispute that Dr. Zandell treated Ms. Marcus poorly. However, poor treatment alone is not enough to support a racial harassment claim. *Uhl,* 121 F.3d at 1137.

Rather, the employee must also show that the treatment was because of her membership in a protected class. *Oncale,* 523 U.S. at 81. Ms. Marcus' claim thus fails on the second element of the prima facie case because she cannot show that Dr. Zandell's poor treatment of her was due to her race or religion. There is ample evidence in the record that Dr. Zandell treated all her employees poorly and had poor management and interpersonal skills. Indeed, every employee who worked under Dr. Zandell in this period complained about her treatment of him or her, with the exception of Ms. Svaldi, who is described as being timid and agreeable. Moreover, even other African-American employees stated that Dr. Zandell did not discriminate on the basis of race, but rather that she treated everyone poorly regardless of race. Ms. Marcus has not introduced any evidence that contradicts this overwhelming evidence that Dr. Zandell is simply an unpleasant individual and a difficult supervisor. Moreover, as discussed in section (I) above, the Director has provided legitimate, non-discriminatory and non-harassing reasons to explain the conduct about which Ms. Marcus complains. Accordingly, this Court finds Ms. Marcus has failed to demonstrate that she was harassed because of her race.

As for Ms. Marcus' claim that she was harassed because of her religion, she has only put forth two incidents of such harassment: (1) Ms. Garth, a VA EEO officer, exploited Ms. Marcus' religious beliefs by asking her, along with Dr. Zandell and Ms. Jaycox, to swear on a Bible to resolve their differences; and (2) Ms. McCullen, another VA EEO officer, told Ms. Marcus that people at Hines Hospital did not like her "church lady act."

Assuming that these incidents occurred, while they may have legitimately offended Ms. Marcus, this Court finds that these isolated incidents are far from being severe and pervasive enough to alter Ms. Marcus' work conditions so as to create a hostile work environment under Title VII.

Consequently, this Court finds that Ms. Marcus has failed as a matter of law to demonstrate that she suffered pervasive enough harassment based on her race or religion to support a claim for hostile work environment based on either racial or religious harassment.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A-98

Not Reported in F.Supp.2d
2002 WL 1263999 (N.D.Ill.)
(Cite as: 2002 WL 1263999 (N.D.Ill.))

### III. Retaliation

Title VII provides that
> It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment ... because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a). To state a claim of retaliation under Title VII, a plaintiff must show that she "(1) engaged in statutorily protected expression; (2) she suffered an adverse action by her employer; and (3) there is a causal link between her protected expression and the adverse action." *McKenzie v. Ill. Dept. of Trans.*, 92 F.3d 473, 483 (7th Cir.1996). Once the plaintiff establishes the above requirements, the defendant then has the burden to articulate a legitimate, non-discriminatory reason for its actions. *McDonnell Douglas*, 411 U.S. at 802-03. If the defendant meets this burden, then the plaintiff must show that its proffered reason is false or pretextual. *Id.* at 804-05. If the plaintiff cannot show pretext, then it cannot proceed with its retaliation claim and summary judgment is appropriate. *Id.*

**\*12** Here, Ms. Marcus contends that, as a result of her statutorily protected conduct in reporting the alleged discrimination, Dr. Zandell retaliated against her by delaying her performance evaluations, not awarding her monetary bonuses for excellent work performance, unfairly assigning her additional work, preventing her from taking advantage of training opportunities at Hines Hospital, threatening her, and thwarting her attempts to transfer out of HCESD. As discussed above, this Court finds that these alleged incidents are either not adverse employment actions or Ms. Marcus has failed to show that Defendants' legitimate proper reasons for the above actions were pretextual, and therefore, the Court finds that the above incidents do not constitute retaliation.

However, this Court will examine Ms. Marcus' contention that, due to her complaint to the Department alleging discrimination, she was denied a transfer to a different position within Hines Hospital or another government agency because Dr. Zandell informed three prospective employers of Ms. Marcus' EEO activity. Ms. Marcus contends

that this constitutes an adverse employment action in retaliation for conduct protected by Title VII.

While Dr. Zandell has admitted to disclosing this information about Ms. Marcus' EEO claims to those with whom she applied for a position, she explained that she did so because she felt that it was relevant to her work attendance due to the time she spent pursuing the suit. She also stated that she felt it was relevant to a question she was asked regarding Ms. Marcus' cooperation with others in the HCESD.

Informing a prospective employer of an employee's EEOC charge is sufficient to constitute an adverse employment action under Title VII. *Czarnowski v. Desoto, Inc.*, 518 F.Supp. 1252, 1259 (N.D.Ill.1981) *. See also Hashimoto v. Dalton*, 118 F.3d 671, 677 (9th Cir.1997); *Rutherford v. American Bank of Commerce*, 565 F.2d 1162, 1164-65 (10th Cir.1977) *. Thus, with respect to this incident, Ms. Marcus has established the first two elements of her prima facie case--participation in a protected activity and an adverse employment action. *See McKenzie*, 92. F.3d at 483. The third element, a causal connection between the protected activity and the adverse employment action, is a question of fact and cannot, therefore, be decided in a summary judgment proceeding.

Consequently, this Court DENIES summary judgment as to Count III regarding Dr. Zandell's disclosure of Ms. Marcus' discrimination complaint to prospective employers.

### CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment [41-1] is GRANTED IN PART as to Counts II and III AND DENIED IN PART as to Count I.

2002 WL 1263999 (N.D.Ill.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**A-99**